1  KEKER & VAN NEST LLP
   ROBERT A. VAN NEST - #84065
2  R. JAMES SLAUGHTER - #192813
   DAN JACKSON - #216091
3  710 Sansome Street
   San Francisco, CA  94111-1704
4  Telephone:  (415) 391-5400
   Facsimile:  (415) 397-7188
5  rvannest@kvn.com
   rslaughter@kvn.com
6  djackson@kvn.com

7  Attorneys for Defendant
   ELECTRONIC ARTS INC.

8

9                      UNITED STATES DISTRICT COURT

10                    NORTHERN DISTRICT OF CALIFORNIA

11

12  SAMUEL MICHAEL KELLER, on behalf of          Case No. CV-09-1967-CW
    himself and all others similarly situated,

13                                               **ELECTRONIC ARTS INC.'S NOTICE OF**
                              Plaintiff,         **MOTION AND SPECIAL MOTION TO**
14                                               **STRIKE PURSUANT TO CAL. CODE**
           v.                                    **CIV. PROC. § 425.16 (ANTI-SLAPP);**
15                                               **MEMORANDUM OF POINTS AND**
    ELECTRONIC ARTS INC.; NATIONAL              **AUTHORITIES IN SUPPORT THEREOF**
16  COLLEGIATE ATHLETICS
    ASSOCIATION; COLLEGIATE                      Date:     September 24, 2009
17  LICENSING COMPANY,                           Time:     2:00 p.m.
                                                 Dept:     Courtroom 2, 4th Floor
18                            Defendants.        Judge:    Hon. Claudia Wilken

19                                               Date Comp. Filed:    May 5, 2009

20

21

22

23

24

25

26

27

28

443598.09

1  **NOTICE OF MOTION AND STATEMENT OF RELIEF SOUGHT**

2  **PLEASE TAKE NOTICE** that on September 24, 2009 at 2:00 p.m. before the

3 Honorable Claudia Wilken, United States District Court, 1301 Clay Street, Suite 400 S, Oakland,

4 California 94612-5212, Courtroom 2, 4th Floor, defendant Electronic Arts, Inc. ("EA") will, and

5 hereby does, move the Court for an order striking plaintiff Samuel Michael Keller's complaint

6 pursuant to California's Anti-SLAPP statute, Cal. Code Civ. Proc. § 425.16.

7  Because plaintiff's claims arise from EA's video games *NCAA Football* and *NCAA*

8 *Basketball / NCAA March Madness*, which are expressive works that involves EA's exercise of

9 free speech rights about a matter of public interest, the claims fall within the scope of

10 section 425.16.  Consequently, the burden shifts to Plaintiff to establish a probability that he will

11 prevail on each of the claims.

12  He cannot meet that burden for each of the following reasons: (1) assuming EA uses

13 Plaintiff's protectable attributes, the use would be protected by the First Amendment and

14 California Constitution because EA's games are expressive and transformative works;

15 (2) assuming EA uses Plaintiff's protectable attributes, the use would be protected by the First

16 Amendment and California Constitution because of the public's strong interest in information

17 about sports and athletes; and (3) Plaintiff has not alleged a recoverable injury.

18  Plaintiff cannot meet his burden with respect to the following individual causes of action

19 as follows: (1) the second cause of action fails on the grounds that if EA uses Plaintiff's

20 protectable attributes, the use would be exempt from liability under section 3344(d)'s "public

21 affairs" exemption; (2) the fourth cause of action fails on the grounds that Plaintiff lacks an

22 underlying tort upon which to base the conspiracy claim; (3) the fifth cause of action fails on the

23 grounds that Plaintiff lacks an underlying tort claim upon which to base the unfair competition

24 claim; (4) the seventh cause of action fails on the grounds that no claim for unjust enrichment

25 exists under California law absent independent grounds—not alleged by Plaintiff—for imposing

26 an implied contract or constructive trust and, even if the court recognizes a claim for unjust

27 enrichment under California law, there exists a valid express contract covering the subject matter

28 at issue.

1

443598.09

For these reasons, EA respectfully requests that the Court grant this Motion to Strike and strike all causes of action asserted against EA.

This Motion is based on this Notice; on the attached Memorandum of Points and Authorities; on the concurrently-filed Request for Judicial Notice and Declarations of Jeremy Strauser and Sean O'Brien with Exhibits A through H; on the concurrently lodged editions of *NCAA Football 06* through *NCAA Football 09*, *NCAA March Madness 06* through *NCAA March Madness 08*, and *NCAA Basketball 09*, PlayStation 2 console, and two controllers; on the concurrently filed Motion to Dismiss; on any other matters of which this Court may take judicial notice; on all pleadings, files, and records in this action; and on such other argument as may be received by this Court at the hearing on this Motion.

Dated:  July 29, 2009                                KEKER & VAN NEST LLP


                                                    By: */s/ Robert A. Van Nest*
                                                         ROBERT A. VAN NEST
                                                         Attorneys for Defendant
                                                         ELECTRONIC ARTS INC.

443598.09

**TABLE OF CONTENTS**

Page(s)

I.      INTRODUCTION ...........................................................................................1

II.     BACKGROUND .............................................................................................4

III.    ARGUMENT ..................................................................................................5

        A.      The Anti-SLAPP Statute Broadly Protects Conduct in Furtherance of
                Free Speech. ........................................................................................5

        B.      Plaintiff's Claims Fall Within the Scope of the Anti-SLAPP Statute. ...................7

                1.      EA's Games are Expressive Works Protected by the First
                        Amendment. ..........................................................................7

                2.      EA's Games Relate to an "Issue of Public Interest." ...................9

        C.      Plaintiff Cannot Meet His Burden of Demonstrating A Probability of
                Prevailing on His Claims. ..................................................................12

                1.      The First Amendment and California Constitution Defeat
                        Plaintiff's Misappropriation Claims Because Any Use is
                        Transformative. ..................................................................13

                2.      The First Amendment and the California Constitution Bar
                        Plaintiff's Claims Because of the Public's Strong Interest in
                        Information About Sports and Athletes. .................................16

                3.      Meritorious Misappropriation Claims Target Advertisements. .................18

                4.      All of Plaintiff's Claims Fail Because He Has Not Alleged A
                        Recoverable Injury. ............................................................19

                5.      Plaintiff's California Statutory Misappropriation Claim is
                        Barred by the Statute's "Public Affairs" Exemption. .................21

                6.      Plaintiff's Civil Conspiracy Claim Fails Because There is No
                        Underlying Tort. .................................................................22

                7.      Plaintiff's Section 17200 Fails Because It Lacks a Predicate
                        Violation and Seeks an Unavailable Remedy. ..........................23

                8.      Plaintiff's Unjust Enrichment Claim Fails Because There is No
                        Such Claim Under California Law and an Express Contract
                        Covers the Same Subject. ....................................................24

IV.     CONCLUSION..............................................................................................25

i

443598.09

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*4 Hour Wireless v. Smith*
   01 Civ 9133, 2002 U.S. Dist. LEXIS 22680 (S.D.N.Y. Nov. 22, 2002) ...................................25

*Abdul-Jabbar v. Gen. Motors Corp.*
   85 F.3d 407 (9th Cir. 1996) .........................................................................................................19

*Ashcroft v. Iqbal*
   556 U.S. ---, 129 S.Ct. 1937 (2009)...........................................................................................3, 20

*Barnett v. Evans*
   No. C 06-0193 CW (PR), 2009 WL 799402 (N.D. Cal. March 24, 2009)..............................20

*Batzel v. Smith*
   333 F.3d 1018 (9th Cir. 2003) .......................................................................................................1

*Bell Atlantic Corp. v. Twombly*
   550 U.S. 544 (2007).........................................................................................................20, 21, 23

*Butler v. Target Corp.*
   323 F. Supp. 2d 1052 (C.D. Cal. 2004) .....................................................................................20

*C.B.C. Distribution and Marketing v. Major League Baseball Advanced
   Media*
   505 F.3d 818 (8th Cir. 2007) .............................................................................3, 11, 17, 18

*Carafano v. Metrosplash.com, Inc.*
   339 F.3d 1119 (9th Cir. 2003) .....................................................................................................18

*CBS Interactive, Inc. v. National Football League Players Ass'n, Inc.*
   2009 WL 1151982 (D. Minn. April 28, 2009).................................................................11, 17, 18

*Cher v. Forum Int'l*
   692 F.2d 634 (9th Cir. 1982) .......................................................................................................13

*City of Oakland v. Comcast Corp.*
   No. C 06-5380, 2007 WL 518868 (N.D. Cal. Feb. 14, 2007) ...................................................25

*Curtis Publ'g Co. v. Butts*
   388 U.S. 130 (1967) (plurality opinion) .....................................................................................11

*E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*
   444 F. Supp. 2d 1012 (C.D. Cal. 2006), *aff'd* 547 F.3d 1095 (9th Cir.
   2008).........................................................................................................................................8, 15

*Goldman v. Standard Ins. Co.*
   341 F.3d 1023 (9th Cir. 2003) .....................................................................................................23

*Hanni v. Am. Airlines, Inc.*
   2008 WL 5000237 (N.D. Cal. Nov. 21, 2008) ...........................................................................23

*Holt v. Cox Enterprises*
   590 F. Supp. 408 (N.D. Ga. 1984) .............................................................................................11

*Interactive Digital Software Ass'n v. St. Louis County*
   329 F.3d 954 (8th Cir. 2003) .........................................................................................................8

*MAI Systems Corp. v. UIPS*
   856 F. Supp. 538 (N.D. Cal. 1994) .............................................................................................20

*Midler v. Ford Motor Co.*
   849 F.2d 460 (9th Cir. 1988) .......................................................................................................19

ii

443598.09

*Moore v. Univ. of Notre Dame*
  968 F. Supp. 1330 (N.D. Ind. 1997) ........................................................................ 11

*Motschenbacher v. R.J. Reynolds Tobacco Co.*
  498 F.2d 821 (9th Cir. 1974) ................................................................................... 19

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Okla.*
  468 U.S. 85 (1984) .................................................................................................. 11

*New Kids on the Block v. News America Pub., Inc.*
  971 F.2d 302 (9th Cir. 1992) ............................................................................ 10, 21

*Newcombe v. Adolf Coors Co.*
  157 F.3d 686 (9th Cir. 1998) ................................................................................... 19

*Perfect 10, Inc. v. CCBill, LLC*
  488 F.3d 1102 (9th Cir. 2007) ................................................................................. 18

*Regents of the Univ. of Cal. v. Am. Broad. Cos., Inc.*
  747 F.2d 511 (9th Cir. 1984) ................................................................................ 2, 11

*Rogers v. Grimaldi*
  875 F.2d 994 (2d Cir. 1989) .................................................................................... 19

*Romantics v. Activision Publ'g, Inc*
  574 F. Supp. 2d 758 (E.D. Mich. 2008) ....................................................... 8, 15, 19

*Roots Ready Made Garments v. Gap Inc.*
  No. C 07-03363 CRB, 2008 WL 239254 (N.D. Cal. Jan. 28, 2008) ................. 24, 25

*Thomas v. Los Angeles Times Commc'ns LLC*
  189 F. Supp. 2d 1005 (C.D. Cal. 2002), *aff'd* 45 Fed. Appx. 801 (9th
  Cir. 2002) ................................................................................................................. 7

*Time, Inc. v. Johnston*
  448 F.2d 378 (4th Cir. 1971) ................................................................................... 11

*Troy Group, Inc. v. Tilson*
  364 F. Supp. 2d 1149 (C.D. Cal. 2002) ..................................................................... 7

*United States ex rel. Newsham v. Lockheed Missile & Space Co., Inc.*
  190 F.3d 963 (9th Cir. 1999) ..................................................................................... 1

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Counsel, Inc.*
  425 U.S. 748 (1976) ................................................................................................ 19

*Video Software Dealers Ass'n v. Schwarzenegger*
  556 F. 3d 950 (9th Cir. 2009) .................................................................................... 7

*Wendt v. Host Int'l, Inc.*
  125 F.3d 806 (9th Cir. 1997) ................................................................................... 19

*White v. Samsung Elecs. Am., Inc.*
  971 F.2d 1395 (9th Cir. 1992) ................................................................................. 19

*Woodrum v. Woodward County, Okl.*
  866 F.2d 1121 (9th Cir. 1989) ................................................................................. 23

**State Cases**

*Alch v. Superior Court*
  122 Cal. App. 4th 339 (2004) .................................................................................. 24

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*
  7 Cal. 4th 503 (1994) ......................................................................................... 20, 23

iii

ELECTRONIC ARTS, INC.'S SPECIAL MOTION TO STRIKE PURSUANT TO
CAL. CODE CIV. PROC. § 425.16 (ANTI-SLAPP)
CASE NO. CV-09-1967-CW

443598.09

*Boyle v. Anderson Fire Fighters Ass'n Local 1262, AFL-CIO*
497 N.E. 2d 1073 (Ind. Ct. App. 1986) ........................................................23

*Bradbury v. Superior Court*
49 Cal. App. 4th 1108 (1996) ..............................................................1, 12

*Braun v. Chronicle Publ'g Co.*
52 Cal. App. 4th 1036 (1997) ....................................................................6

*Briggs v. Eden Council for Hope & Opportunity*
19 Cal.4th 1106 (1999) ............................................................................6

*Church of Scientology v. Wollersheim*
42 Cal. App. 4th 628 (1996) ....................................................................12

*City of Cotati v. Cashman*
29 Cal. 4th 69 (2002) ................................................................................6

*Comedy III Prods. v. Gary Saderup, Inc.*
25 Cal. 4th 387 (2001) ......................................................................1, 13

*Damon v. Ocean Hills Journalism Club*
85 Cal. App. 4th 468 (2000) ......................................................................9

*Day v. AT&T Corp.*
63 Cal. App. 4th 325 (1998) ....................................................................20

*Dora v. Frontline Video*
15 Cal. App. 4th 536 (1993) ........................................................10, 21, 22

*Equilon Enter., LLC v. Consumer Cause, Inc.*
29 Cal. 4th 53 (2002) ..........................................................................6, 12

*Gionfriddo v. Major League Baseball*
94 Cal. App. 4th 400 (2001) ........................................................... passim

*Hall v. Time Warner, Inc.*
153 Cal. App. 4th 1337 (2007) ..............................................................7, 10

*Indianapolis Horse Patrol, Inc. v. Ward*
247 Ind. 519 (1966) ................................................................................23

*Ingels v. Westwood One Broad. Serv.*
129 Cal. App. 4th 1050 (2005) ..............................................................7, 10

*Kirby v. Sega of America, Inc.*
144 Cal. App. 4th 47 (2006) ..........................................2, 7, 14, 16, 24

*Korea Supply Co. v. Lockheed Martin Corp.*
29 Cal. 4th 1134 (2003) ..........................................................................24

*Kronemyer v. Internet Movie Data Base, Inc.*
150 Cal. App. 4th 941 (2007) ................................................................7, 10

*Lance Camper Mfg. Corp. v. Republic Indem. Co.*
44 Cal. App. 4th 194 (1996) ....................................................................25

*Lieberman v. KCOP Television, Inc.*
110 Cal. App. 4th 156 (2003) ....................................................................7

*Ludwig v. Superior Court*
37 Cal. App. 4th 8 (1995) ..........................................................................1

*M.G. v. Time Warner, Inc.*
89 Cal. App. 4th 623 (2001) ......................................................................7

iv

443598.09

*Matson v. Dvorak*
40 Cal. App. 4th 539 (1995) ...................................................................12

*McKell v. Washington Mut., Inc.*
142 Cal. App. 4th 1457 (2006) ...............................................................24

*Montana v. San Jose Mercury News, Inc.*
34 Cal. App. 4th 790 (1995) ...........................................10, 17, 18, 22

*Navellier v. Sletten*
29 Cal. 4th 82 (2002) ...............................................................................6

*Nygard, Inc. v. Uusi-Kerttula*
159 Cal. App. 4th 1027 (2008) ....................................................9, 10, 12

*Page v. Bakersfield Uniform & Towel Supply Co.*
239 Cal. App. 2d 762 (1966) ...................................................................21

*Peterson v. Cellco P'ship*
164 Cal. App. 4th 1583 (2008) ...............................................................20

*Picton v. Anderson Union High Sch. Dist.*
50 Cal. App. 4th 726 (1996) ...................................................................21

*Robertson v. Rodriquez*
36 Cal. App. 4th 347 (1995) ...................................................................12

*Seelig v. Infinity Broad. Corp.*
97 Cal. App. 4th 798 (2002) ...............................................................7, 10

*Wilbanks v. Wolk*
121 Cal. App. 4th 883 (2004) .................................................................7

*Winter v. DC Comics*
30 Cal. 4th 881 (2003) ...................................................2, 13, 14, 16

**Federal Statutes**

47 U.S.C. § 230(c)(1) .............................................................................18

Communications Decency Act of 1996 ("CDA") ....................................18

**State Statutes**

Cal. Bus. & Prof. Code § 17200 ...............................................5, 20, 23, 24

Cal. Bus. & Prof. Code § 17204 ...............................................................20

Cal. Bus. & Prof. Code § 18895.2 ...........................................................21

Cal. Bus. & Prof. Code § 18897.6 ...........................................................21

Cal. Bus. & Prof. Code § 18897.93 .........................................................21

Cal. Civ. Code § 3344 ...........................................................................5, 21

Cal. Civ. Code § 3344(a) .........................................................................18

Cal. Civ. Code § 3344(d) .......................................................1, 9, 21, 22

Cal. Code Civ. Proc. § 425.16 ...........................................1, 2, 6, 7, 9

Cal. Code Civ. Proc. § 425.16(b)(1) ...................................................6, 12

Cal. Code Civ. Proc. § 425.16(e)(4) .........................................................6

**Treatises**

RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 47, comment ................19

v

443598.09

**Constitutional Provisions**

Cal. Const. art. 1, § 2 ......................................................................................7

United States Constitution, First Amendment .................................................... *passim*

ELECTRONIC ARTS, INC.'S SPECIAL MOTION TO STRIKE PURSUANT TO
CAL. CODE CIV. PROC. § 425.16 (ANTI-SLAPP)
CASE NO. CV-09-1967-CW

443598.09

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.    INTRODUCTION**

3      The California Supreme Court has warned that "[t]he right of publicity has a potential for

4 frustrating" constitutionally protected expression. *Comedy III Prods. v. Gary Saderup, Inc.*, 25

5 Cal. 4th 387, 397 (2001). This lawsuit exemplifies that risk, and underscores why California

6 courts repeatedly reject misappropriation claims that target constitutionally protected expressive

7 works, like EA's *NCAA Football* and *NCAA Basketball / NCAA March Madness* video games.

8      Plaintiff Sam Keller, a former college football player, alleges—on behalf of himself and a

9 putative class of college football and basketball players—that EA improperly used his and other

10 college athletes' "likenesses," not in advertisements or packaging, but in EA's *NCAA Football*

11 and *NCAA Basketball / NCAA March Madness* video games. Even assuming EA used Plaintiff's

12 likeness, the alleged use of such information is protected by the First Amendment and the free

13 speech guarantees of the California Constitution. Plaintiff's complaint, therefore, is a "Strategic

14 Lawsuit Against Public Participation" ("SLAPP"), and must be dismissed pursuant to

15 California's Anti-SLAPP statute. Cal. Code Civ. Proc. § 425.16.[1]

16      To provide for the "fast and inexpensive unmasking and dismissal" of claims that target

17 expressive works about matters of public interest, like Plaintiff's, the California legislature

18 enacted the Anti-SLAPP statute, California Code of Civil Procedure Section 425.16. *Ludwig v.*

19 *Superior Court*, 37 Cal. App. 4th 8, 16 (1995). Once EA shows that the alleged conduct was "in

20 furtherance" of its rights of free speech under the First Amendment and California Constitution,

21 the burden shifts to Plaintiff to demonstrate that he has a "probability" of success on the merits.

22 To meet his burden, Plaintiff must substantiate his claims and overcome the defendant's

23 defenses. *Bradbury v. Superior Court*, 49 Cal. App. 4th 1108, 1117 (1996). This burden is

24 equivalent to the burden on a motion for summary judgment; Plaintiff must introduce admissible

25 evidence that would be sufficient to sustain a judgment in his favor. If he does not, his causes of

26

---

[1]      A defendant in federal court may file a special motion to strike under the Anti-SLAPP

27 statute to dispose of state-law claims. *See, e.g., United States ex rel. Newsham v. Lockheed*
*Missile & Space Co., Inc.*, 190 F.3d 963, 973 (9th Cir. 1999); *Batzel v. Smith*, 333 F.3d 1018,

28 1025-26 (9th Cir. 2003).

1

443598.09

1   action against EA must be stricken.

2       Here, EA has satisfied its burden of demonstrating that Plaintiff's claims arise from EA's

3   exercise of its free speech rights concerning a matter of public interest.  Indeed, it is settled that

4   video games, like *NCAA Football* and *NCAA Basketball / NCAA March Madness*, are

5   "expressive works entitled to as much First Amendment protection as the most profound

6   literature." *Kirby v. Sega of America, Inc.*, 144 Cal. App. 4th 47, 58 (2006).  It is also settled that

7   the subject of the games at issue—college football and basketball—is a matter of "public

8   interest."  *See, e.g.*, *Regents of the Univ. of Cal. v. Am. Broad. Cos., Inc.*, 747 F.2d 511, 521 (9th

9   Cir. 1984).  Under Section 425.16, the burden thus shifts to Plaintiff to demonstrate—with

10  admissible evidence—that he has a probability of prevailing on each of this claims.

11      Plaintiff cannot meet that burden.  Even assuming for the purposes of this motion that EA

12  used some protectable element of Plaintiff's likeness, Plaintiff's misappropriation claims against

13  EA would be barred by the First Amendment and the California Constitution.  To prevent the

14  stifling of free expression, courts have narrowly circumscribed statutory and common law

15  misappropriation claims that target video games and other protected works.  *See, e.g.*, *Winter v.*

16  *DC Comics*, 30 Cal. 4th 881, 888 (2003); *Kirby*, 144 Cal. App. 4th at 58.  An expressive work

17  that incorporates an individual's likeness is constitutionally protected if the use is

18  "transformative." *Winter*, 30 Cal. 4th at 888.  The relevant inquiry "is whether the celebrity

19  likeness is one of the raw materials from which an original work is synthesized," in which case it

20  is protected, "or whether the depiction … of the celebrity is the very sum and substance of the

21  work in question." *Id*.  The accompanying editions of *NCAA Football* and *NCAA Basketball /*

22  *NCAA March Madness* show that the games are much more than a "mere celebrity likeness[]."

23  Because any purported use of Plaintiff's likeness would qualify as transformative, the First

24  Amendment defeats his misappropriation claims.  *Id*.

25      Separately, courts repeatedly have held that the public's particular interest in information

26  about sports and athletes "far outweighs" the athletes' rights of publicity.  *Gionfriddo v. Major*

27  *League Baseball*, 94 Cal. App. 4th 400, 415 (2001).  Information such as athletes' names,

28  likenesses, performance statistics, and biographical information—just the type of information

1    Plaintiff claims EA isn't allowed to incorporate in its works—"command[s] a substantial public

2    interest" and therefore "is a form of expression due substantial constitutional protection." *Id.*

3    This is true even where such information is used in works such as sports websites and fan-driven

4    "fantasy" baseball games, which are far less expressive and transformative than the video games

5    at issue here. *See id.*; *C.B.C. Distribution & Marketing Inc. v. Major League Baseball Advanced*

6    *Media, L.P.*, 505 F.3d 818, 823 (8th Cir. 2007).

7         All of Plaintiff's claims fail for the further separate and independent reason that he does

8    not allege facts demonstrating that he was injured by EA's alleged use of his likeness, a

9    necessary element of each of his claims.  The Supreme Court has recently affirmed that a

10    plaintiff may not rely on conclusory allegations or bare recitations of the elements of his claims.

11    *See Ashcroft v. Iqbal*, 556 U.S. ---, 129 S.Ct. 1937, 1949-50 (2009).  Since Plaintiff alleges

12    nothing more than empty conclusions regarding injury, all of his claims for this reason as well.

13         Plaintiff's individual causes of action fail for numerous additional reasons.  Plaintiff's

14    second cause of action alleging violation of the California statutory right of publicity is barred by

15    the statute's "public affairs" exception.  Courts have held that sports and information about

16    athletes fall within the "public affairs" category, thereby barring statutory right-of-publicity

17    claims involving such matters.  Plaintiff's allegations regarding the popularity of college sports

18    and EA's games demonstrate that his claims are barred by this defense. *See* Compl. ¶¶ 4-6.

19    Plaintiff's fourth cause of action for civil conspiracy claim fails because there is no underlying

20    tort on which to base it, and because it is not supported by any factual allegations at all, but mere

21    legal conclusions "on information and belief."  Plaintiff's fifth cause of action for unfair

22    competition is entirely derivative and thus fails for the same reasons as his other claims.

23    Plaintiff's seventh cause of action for unjust enrichment is not recognized under California law

24    and is barred by the existence of a contract covering the same subject matter.

25         For these and other reasons explained in detail below, Plaintiff cannot demonstrate any

26    possibility—much less the required probability—of prevailing on his claims against EA.  Under

27    California's Anti-SLAPP statute and clearly established authority, the Court should strike all of

28    Plaintiff's claims against EA.

## II.   BACKGROUND

Defendant Electronic Arts Inc. is a leading developer and publisher of video games, including the *NCAA Football* franchise and the *NCAA Basketball / NCAA March Madness* franchise. Each annual edition of *NCAA Football* is released no later than July of the previous year; for example, *NCAA Football 06* was released in July 2005, and *NCAA Football 09* was released in July 2008. Electronic Arts Inc.'s Request for Judicial Notice ("RJN") ¶ 4. Likewise, each annual edition of *NCAA Basketball* (formerly titled *NCAA March Madness*) is released no later than December of the previous year, with the exception of *NCAA March Madness 07* which was released in January 2007; again, for example, *NCAA March Madness 06* was released in October 2005, and *NCAA Basketball 09* was released in November 2008. *Id.*

These two game franchises simulate the excitement and challenge of college football and college basketball by combining advanced computer and software engineering with artistic expression. As a review of the games demonstrates, the virtual world of the games is comprised of originally designed locations, players, coaches, fans and other game elements. *Id.* ¶¶ 1-3. Players manipulate these elements through game controls, allowing a fully interactive, real-time college sports experience, complete with television-quality images and realistic sounds. *Id.* Players can match more than a hundred teams against each other, control team strategy decisions and individual athletes' movements, and tinker with such subtle details as the weather and crowd noise. *Id.* The interactive environment also allows players to control teams for entire seasons or manage the college program over a series of years, including recruiting in-game players from high school and monitoring their academic performance off the field or court. *Id.*

As a review of the games demonstrates, these games are constructed from an array of graphics, sounds and information. A collection of characteristics such as height, weight, agility and strength is assigned to a virtual player, represented in the game by an original graphic created by EA. *Id.* These characteristics are displayed visually on certain games screens, but also used by the game as parameters for that virtual player's performance. *Id.* The virtual player is assigned to a team, clothed in a jersey and given a number—game elements all properly licensed from the NCAA and its licensing representative, the CLC. Compl. ¶ 11 ("pursuant to a

4

1   license with the CLC, the NCAA's licensing company, Electronic Arts replicates team logos,

2   uniforms, mascots, and even member school stadiums with almost photographic realism").

3   Game players can customize virtual players and teams based on their own preferences or accept

4   the game's default settings.  RJN ¶ 1-3.  EA's games allow competition against opponents

5   controlled by the game itself, a person connected to the same system, or a person connected over

6   the Internet.  *Id.*

7          On May 5, 2009, Plaintiff commenced this action alleging that EA, the NCAA and the

8   CLC improperly use the "likenesses" of real college athletes in the *NCAA Football* and *NCAA*

9   *Basketball / NCAA March Madness* games.  Compl. ¶ 1.  Plaintiff is a former college football

10  player.  *Id.* ¶ 3.  From 2003 to 2005, Plaintiff played quarterback for Arizona State University.

11  *Id.* ¶¶ 43-45.  In 2006, he transferred to the University of Nebraska, but sat out the season under

12  NCAA rules regulating player transfers.  *Id.* ¶ 46.  Plaintiff then played quarterback for

13  Nebraska in 2007, which marked the end of his collegiate football career.  *See id.* ¶ 47.  As a

14  condition of his eligibility for collegiate athletics, Plaintiff agreed to be bound by the NCAA's

15  amateurism rules.  *Id.* ¶¶ 13-14.

16         Plaintiff concedes that the games themselves, as sold by EA, do not include players'

17  names or actual pictures.  *See* ¶ 34 (EA "omits … the real-life player's name on the jersey of his

18  electronic equivalent.");  *id.* ¶ 2 (purported class is NCAA athletes whose "likenesses and distinct

19  appearances," not pictures, allegedly were used).  Nevertheless, Plaintiff has sued, on behalf of

20  himself and a putative class of college athletes, alleging the misuse of their "names and

21  likenesses."  *Id.* ¶ 72.  Keller asserts five causes of action against EA: (1) violation of his

22  statutory rights of publicity under California Civil Code section 3344; (2) violation of his

23  California common law rights of publicity; (3) civil conspiracy; (4) violation of California

24  Business and Professions Code section 17200; and (5) unjust enrichment.

25                              **III.    ARGUMENT**

26  **A.    The Anti-SLAPP Statute Broadly Protects Conduct in Furtherance of Free Speech.**

27         In 1993, the California Legislature enacted the Anti-SLAPP statute "to nip SLAPP

28  litigation in the bud[,]" by quickly disposing of claims that target the exercise of free speech

ELECTRONIC ARTS INC.'S SPECIAL MOTION TO STRIKE PURSUANT TO
CAL. CODE CIV. PROC. § 425.16 (ANTI-SLAPP)
CASE NO. CV-09-1967-CW

443598.09

1    rights. *See Braun v. Chronicle Publ'g Co.*, 52 Cal. App. 4th 1036, 1042 (1997).  Under anti-

2    SLAPP, any "cause of action against a person arising from any act … in furtherance of the

3    person's right of … free speech … in connection with a public issue shall be subject to a special

4    motion to strike, unless the court determines that the plaintiff has established that there is a

5    probability that the plaintiff will prevail on the claim." Cal. Code Civ. Proc. § 425.16(b)(1).

6         Reacting to court rulings that interpreted the statute too narrowly and did not go far

7    enough to quash lawsuits that targeted free speech, the Legislature amended the statute in 1997

8    to ensure that it "shall be construed broadly."  The California Supreme Court subsequently

9    declared that "the broad construction expressly called for in [Section 425.16] is desirable from

10   the standpoint of judicial efficiency," and cautioned "that [a narrow construction] would serve

11   Californians poorly." *Briggs v. Eden Council for Hope & Opportunity*, 19 Cal.4th 1106, 1120-

12   22 (1999).[2]

13        The California Supreme Court has established a two-step process for determining

14   whether a claim must be stricken under Anti-SLAPP. *See Equilon*, 29 Cal. 4th at 67.  "First, the

15   court decides whether the defendant has made a threshold showing that the challenged cause of

16   action is one arising from protected activity," which includes *any* conduct "in furtherance of the

17   defendant's right of . . . free speech under the United States or California Constitution in

18   connection with a public issue." *Id.* (brackets omitted; quoting Cal. Code Civ. Proc.

19   § 425.16(b)(1)); *see also* Cal. Code Civ. Proc. § 425.16(e)(4).  Second, if the defendant has made

20   a threshold showing that the claim arises from protected activity, the burden shifts to the plaintiff

21   to demonstrate "a probability of prevailing on the claim." *Equilon*, 29 Cal. 4th at 67; *see also*

22   Cal. Code Civ. Proc. § 425.16(b)(1).

23        To prevent plaintiffs from using artful pleading to evade the anti-SLAPP statute, court

24   have emphasized that Section 425.16 applies to *any* claim arising from protected conduct,

25   regardless of how the claim in labeled. *Navellier*, 29 Cal. 4th at 92.  "Further, that conduct is not

---

[2]    In a series of decisions in 1992, the California Supreme Court reaffirmed that Section
425.16 must be construed broadly. *See Equilon Enter., LLC v. Consumer Cause, Inc.*, 29 Cal.
4th 53, 61 (2002); *City of Cotati v. Cashman*, 29 Cal. 4th 69, 76 (2002); *Navellier v. Sletten*, 29
Cal. 4th 82, 92 (2002).

ELECTRONIC ARTS INC.'S SPECIAL MOTION TO STRIKE PURSUANT TO
CAL. CODE CIV. PROC. § 425.16 (ANTI-SLAPP)
CASE NO. CV-09-1967-CW

443598.09

1    limited to the exercise of its right of free speech, but to all conduct *in furtherance* of the exercise

2    of the right of free speech in connection with a public issue." *Lieberman v. KCOP Television,*

3    *Inc.*, 110 Cal. App. 4th 156, 166 (2003) (emphases in original); *see also Wilbanks v. Wolk*, 121

4    Cal. App. 4th 883, 897 (2004) (Anti-SLAPP protects "*conduct* in furtherance of free speech

5    rights, regardless whether that conduct occurs in a place where ideas are freely exchanged")

6    (emphasis in original).  Thus, courts have held the statute to apply to a variety of claims,

7    including misappropriation and unfair business practices. *See, e.g., M.G. v. Time Warner, Inc.,*

8    89 Cal. App. 4th 623, 630 (2001) (misappropriation); *Ingels v. Westwood One Broad. Serv.*, 129

9    Cal. App. 4th 1050, 1059 (2005) (unfair business practices).

10           Consistent with the broad interpretation expressly required by the statute, courts have

11   applied Section 425.16 to claims arising from a variety of expressive works, including:  a

12   provocative radio deejay's morning show (*Seelig v. Infinity Broad. Corp.*, 97 Cal. App. 4th 798,

13   808 (2002)); a radio talk show about dating (*Ingels*, 129 Cal. App. 4th at 1059); a segment of the

14   television program *Celebrity Justice* about an actor's housekeeper (*Hall v. Time Warner, Inc.*,

15   153 Cal. App. 4th 1337, 1341 (2007)); a newspaper article (*Thomas v. Los Angeles Times*

16   *Commc'ns LLC,* 189 F. Supp. 2d 1005, 1010 (C.D. Cal. 2002), *aff'd* 45 Fed. Appx. 801 (9th Cir.

17   2002)); an email message (*Troy Group, Inc. v. Tilson*, 364 F. Supp. 2d 1149, 1155 (C.D. Cal.

18   2002)); and a website's listing of producer credits on a motion picture (*Kronemyer v. Internet*

19   *Movie Data Base, Inc.*, 150 Cal. App. 4th 941, 949 (2007)).

20   **B.    Plaintiff's Claims Fall Within the Scope of the Anti-SLAPP Statute.**

21         **1.    EA's Games are Expressive Works Protected by the First Amendment.**

22           Each of plaintiff's claims arise solely from the alleged use of his "likeness" in EA's

23   *NCAA Football* and *NCAA Basketball / NCAA March Madness* video games.  Compl. ¶¶ 1-2, 16-

24   17, 40-42, 58, 61, 67, 72, 76, 79, 83, 87, 90.  It is settled that video games are constitutionally

25   protected works under the First Amendment and California Constitution, article 1, section 2.

26   *See, e.g., Video Software Dealers Ass'n v. Schwarzenegger*, 556 F. 3d 950, 958 (9th Cir. 2009)

27   ("video games are a form of expression protected by the First Amendment"); *Kirby v. Sega of*

28   *America, Inc.*, 144 Cal. App. 4th 47, 58 (2006) ("[v]ideo games are expressive works entitled to

7

443598.09

1   as much First Amendment protection as the most profound literature"); *Interactive Digital*

2   *Software Ass'n v. St. Louis County*, 329 F.3d 954, 957 (8th Cir. 2003) ("[i]f the first amendment

3   is versatile enough to 'shield [the] painting of Jackson Pollock, music of Arnold Schoenberg, or

4   Jabberwocky verse of Lewis Carroll,'" there is "no reason why the pictures, graphic design,

5   concept art, sounds, music, stories and narrative present in video games are not entitled to a

6   similar protection") (citations omitted).

7           The First Amendment's protection is not limited to select games with complex story

8   lines, scripts, and dialogue. *Romantics v. Activision Publ'g, Inc*, 574 F. Supp. 2d 758, 765 (E.D.

9   Mich. 2008).  Instead, the critical issue is whether the games have independent creative elements.

10  *Id.*  In *Romantics*, for instance, the court considered whether *Guitar Hero*—which allows players

11  to pretend they are in a rock band—was entitled to First Amendment protection.  *Id* at 766.  The

12  Court easily concluded that the game was an expressive work because it "allow[ed] players to

13  customize their game play experience, contain[ed] large amounts of original artwork, and

14  require[d] complex synchronization so that the audio and visual elements of the [g]ame line up

15  with a player's manipulation of the controller."  *Id.*; *see also E.S.S. Entm't 2000, Inc. v. Rock*

16  *Star Videos, Inc.*, 444 F. Supp. 2d 1012, 1039 (C.D. Cal. 2006), *aff'd* 547 F.3d 1095 (9th Cir.

17  2008) (holding that video game that "features three virtual cities, each of which contains

18  hundreds of interactive locations created by animated graphics[,] incorporates a narrative, and

19  offers an array of musical soundtracks . . . clearly qualifies as an 'artistic work' entitled to First

20  Amendment protection").

21          *NCAA Football* and *NCAA Basketball / NCAA March Madness* share similar creative

22  elements.  As a review of the games demonstrates, EA's games combine complex computer

23  engineering with artistic expression.  RJN ¶¶ 1-3.  Each annually updated edition of the games

24  features original graphics, videos, sound, music and game scenarios, all keyed to the players'

25  manipulation of the game controls and other input.  *Id.*  These elements are synchronized to

26  deliver television-quality images and realistic sounds, such as the crunch of football pads, the

27  swish of basketball nets, licensed fight songs for many of the college teams, and play-by-play

28  commentary describing the action.  *Id.*  The games allow users to choose among hundreds of

8

443598.09

1   teams, direct team strategy decisions and control individual athlete's movements in real time. *Id.*

2   Users can take control of a team as it exists in EA's games or customize it based on their own

3   preferences, altering the characteristics of individual players. *Id.* The interactive environment

4   extends beyond single games, allowing players to control teams for entire seasons or manage a

5   college program over a series of years. *Id.* As the above game content and features clearly

6   demonstrate, the creativity and complexity of *NCAA Football* and *NCAA Basketball / NCAA*

7   *March Madness* far exceeds that of other video games found to be constitutionally protected

8   expressive works.

9          2.      **EA's Games Relate to an "Issue of Public Interest."**

10          In addition, *NCAA Football* and *NCAA Basketball / NCAA March Madness* relate to a

11   matter of public interest within the meaning of the anti-SLAPP statute. Whether an "issue of

12   public interest" is involved is construed broadly. *See Nygard, Inc. v. Uusi-Kerttula*, 159 Cal.

13   App. 4th 1027, 1039 (2008). Matters of public interest are not restricted to traditional news

14   reports about current events or government conduct. Instead, "[t]he definition of 'public interest'

15   within the meaning of [Section 425.16] has been broadly construed to include not only

16   governmental matters, but also private conduct that impacts a broad segment of society." *Damon*

17   *v. Ocean Hills Journalism Club*, 85 Cal. App. 4th 468, 470 (2000). "Taken together, these cases

18   and the legislative history that discusses them suggest that 'an issue of public interest' . . . is *any*

19   *issue in which the public is interested.*" *Nygard*, 159 Cal. App. 4th at 1042. "In other words,

20   the issue need not be 'significant' to be protected by the anti-SLAPP statute—it is enough that it

21   is one in which the public takes an interest." *Id.* at 1042.[3]

22   _____

23   [3]       For clarity, three distinct, but related, public interest/public matter inquiries are before the
     Court in this motion. *First*, the Court must consider whether college sports are matters of public

24   interest in deciding whether to extend anti-SLAPP protection to EA's games. This inquiry
     requires only a showing that college sports are an "issue in which the public is interested."

25   *Nygard*, 159 Cal. App. 4th at 1043; *supra* Section III(B)(2). *Second*, the First Amendment
     provides a defense to Plaintiff's right of publicity claims because Plaintiff seeks to prevent EA

26   from using publicly available information that "commands a substantial public interest."
     *Gionfriddo*, 94 Cal. App. 4th at 411; *infra* Section III(C)(2). *Third*, California Civil Code section

27   3344(d) provides an exemption to the statutory right of publicity for use "in connection with any
     ... public affairs." Cal. Civ. Code § 3344(d). Although the "public affairs" exemption only

28   applies to statutory claims—as opposed to the absolute defense provided by the First
     Amendment for information commanding substantial public interest—the exemption provides

9

Recent court decisions underscore the breadth of an "issue of public interest" for anti-SLAPP purposes. For example, in *Nygard* the court held that allegedly defamatory statements about a Finnish businessman related to an issue of "public interest" within the meaning of Anti-SLAPP because the Finnish public—the target audience of the defendant magazine—took an interest in him. *Nygard*, 159 Cal. App. 4th at 1042. In *Seelig v. Infinity Broad. Corp.*, 97 Cal. App. 4th 798 (2002), the court noted that the reality show "Who Wants to Marry a Millionaire" had been "of significant interest to the public and the media" because of "what its advent signified about the condition of American society," and because of "the presumed millionaire lifestyle to be furnished by the groom." *Id.* at 807-08. In *Ingels v. Westwood One Broadcasting Service*, 129 Cal. App. 4th 1050 (2005), the court held an on-air exchange from a talk radio show about dating to be related to an issue of public interest. *Id.* at 1058. In *Kronemyer v. Internet Movie Data Base, Inc.*, 150 Cal. App. 4th 941 (2007), the court found a website listing the producer credits for the movie "My Big Fat Greek Wedding" to be a topic of "widespread public interest." *Id.* at 949. And in *Hall v. Time Warner, Inc.*, 153 Cal. App. 4th 1337 (2007), the court concluded that a segment on the television show *Celebrity Justice* about Marlon Brando's housekeeper satisfied the anti-SLAPP statute's public interest requirement. *Id.* at 1346-47.

Building on the wide range of subjects above, courts have recognized the significant public interest in sports—both because of their broad impact on popular culture and the particular attention paid to the details of sporting events and athletes' performance. For instance, in *Dora v. Frontline Video*, 15 Cal. App. 4th 536 (1993), the court found that a documentary-style program about surfing in Southern California was a matter of public interest, explaining that surfing "is of more than passing interest to some" and "has created a life-style that influences speech, behavior, dress, and entertainment, among other things." *Id.* at 546. Two years later, the court in *Montana* explained that "the same public interest considerations [that the *Dora* court found] applicable to surfing apply with equal force to professional football." *Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790, 795-796 (1995). In *Gionfriddo*,

---

broader protection against those claims than the First Amendment. *New Kids on the Block v. News America Pub., Inc.*, 971 F.2d 302, 310 n.10 (9th Cir. 1992); *infra* Section III(C)(5).

ELECTRONIC ARTS INC.'S SPECIAL MOTION TO STRIKE PURSUANT TO
CAL. CODE CIV. PROC. § 425.16 (ANTI-SLAPP)
CASE NO. CV-09-1967-CW

443598.09

1   the court reached a similar conclusion regarding baseball.  94 Cal. App. 4th at 416.  The

2   *Gionfriddo* court emphasized "baseball's pervasive influence on our culture[,]" and declared that

3   information about former Major League players is "of interest to the public[.]"  *Id.* at 411.  *See*

4   *also C.B.C. Distribution and Marketing v. Major League Baseball Advanced Media*, 505 F.3d

5   818, 823 (8th Cir. 2007) (recognizing "the public value of information about the game of

6   baseball and its players"; "names, nicknames, likenesses, signatures, pictures, playing records,

7   and/or biographical data . . . 'command a substantial public interest.'"); *CBS Interactive v.*

8   *National Football League Players Association*, Civil No. 08-5097 ADM/SRN, 2009 WL

9   1151982, at *21 (D. Minn. April 28, 2009).

10          While not specifically limited to the SLAPP context, many courts have recognized that

11  college football and basketball are matters of public interest.  The Supreme Court has twice

12  discussed the public's interest in college football.[4]  Numerous lower courts, including the Ninth

13  Circuit, have reached similar conclusions with regard to collegiate football and basketball.[5]

14  These decisions reflect the popularity of and public interest in collegiate football and basketball.

15          Plaintiff tacitly acknowledges the significant public interest in collegiate sports, noting

16  that "[t]he annual revenues for the NCAA in fiscal year 2007-08 were $614 million," with

17  "almost 90%" of the annual budget revenues coming from the consumer-driven fields of

18  "marketing and television rights."  Compl. ¶ 5.

19          Under these circumstances, *NCAA Football and NCAA Basketball / March Madness* fall

20  _____

21  [4]      *See Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 154-55 (1967) (plurality opinion)
    (discussing "the public interest in the circulation of" an article on college football); *Nat'l*
22  *Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 117 (1984)
    (discussing "public interest in intercollegiate athletics").

23  [5]      *See, e.g., Regents of the Univ. of Cal. v. Am. Broad. Cos.*, 747 F.2d 511, 521 (9th Cir.
    1984) ("Guided by the Supreme Court's recent articulation of the 'public interest' in the college
24  football television market, we cannot say that the district court abused its discretion in finding
    that the public interest is directly served through the issuance of a narrow preliminary
25  injunction."); *Time, Inc. v. Johnston*, 448 F.2d 378, 380-83 (4th Cir. 1971) (finding a college
    basketball coach to be "involved as a public figure in basketball"); *Moore v. Univ. of Notre*
26  *Dame*, 968 F. Supp. 1330, 1337 (N.D. Ind. 1997) ("[I]t is this court's opinion that football, and
    specifically Notre Dame football is a matter of public interest."); *Holt v. Cox Enterprises*, 590 F.
27  Supp. 408, 412 (N.D. Ga. 1984) (discussing public interest in Georgia Tech-Alabama college
    football rivalry).

28

11

ELECTRONIC ARTS INC.'S SPECIAL MOTION TO STRIKE PURSUANT TO
CAL. CODE CIV. PROC. § 425.16 (ANTI-SLAPP)
CASE NO. CV-09-1967-CW

443598.09

1   well within the bounds of being a subject "in which the public takes an interest." *Nygard*, at

2   1042. If a deejay's rant about a reality show contestant, a movie about a fictional Kazakh citizen

3   traveling in the United States, a radio talk show host's diatribe against a caller, a documentary

4   about surfing, and a poster of former San Francisco 49ers quarterback Joe Montana all relate to

5   matters of public interest under the Anti-SLAPP statute, so, too, do EA video games about

6   college football and basketball.

7   　　　Since *NCAA Football* and *NCAA Basketball / NCAA March Madness* are protected by the

8   First Amendment and relate to a matter of public interest, EA is entitled to invoke the protections

9   of anti-SLAPP.

10  **C.**　**Plaintiff Cannot Meet His Burden of Demonstrating A Probability of Prevailing on**
         **His Claims.**

11

12  　　　Because EA's conduct falls within the scope of the anti-SLAPP statute, the burden shifts

13  to Plaintiff to present competent, specific evidence establishing a probability that he will prevail

14  at trial on his claims. *See* Cal. Civ. Proc. Code § 425.16(b)(1); *Bradbury*, 49 Cal. App. 4th at

15  1117. This burden is substantial. It is tested by the same standard governing motions for

16  summary judgment, nonsuit, or directed verdict. *See Matson v. Dvorak*, 40 Cal. App. 4th 539,

17  548 (1995); 1 Robert I. Weil & Ira A. Brown, Jr., Cal. Civ. Proc. Before Tr. ¶ 7:1008 (2009). A

18  plaintiff cannot simply rely on the allegations set forth in his complaint, nor can a court accept

19  those allegations. *Church of Scientology v. Wollersheim*, 42 Cal. App. 4th 628, 656 (1996).

20  Instead, the plaintiff must "meet the defendant's constitutional defenses," *Robertson v.*

21  *Rodriquez*, 36 Cal. App. 4th 347, 359 (1995), and must present "competent evidence" showing

22  that he will "probably prevail at trial." *Bradbury*, 49 Cal. App. 4th at 1117. If the plaintiff fails

23  to carry his evidentiary burden, the Court must strike his claim. *See* Cal. Code Civ. Proc.

24  § 425.16(b)(1); *Equilon*, 29 Cal. 4th at 67.

25  　　　As a matter of law, Plaintiff cannot satisfy these burdens. Therefore, his claims against

26  EA should be stricken.[6]

27  _____

28  [6]　　　The remainder of EA's motion is substantially identical to Sections III(B) to III(G) of
    EA's concurrently filed motion to dismiss.

ELECTRONIC ARTS INC.'S SPECIAL MOTION TO STRIKE PURSUANT TO
CAL. CODE CIV. PROC. § 425.16 (ANTI-SLAPP)
CASE NO. CV-09-1967-CW

443598.09

1    **1.    The First Amendment and California Constitution Defeat Plaintiff's**
2    **Misappropriation Claims Because Any Use is Transformative.**

3    The California Supreme Court has cautioned that "[t]he right of publicity has a potential

4    for frustrating" constitutionally protected expression. *Comedy III Prods., Inc. v. Gary Saderup,*

5    *Inc.*, 25 Cal. 4th 387, 397 (2001) (internal quotations omitted).  To protect expressive works, the

6    Court "has subjected the 'right of publicity' under California law to a narrowing interpretation

7    which accords with First Amendment values." *Cher v. Forum Int'l*, 692 F.2d 634, 638 (9th Cir.

8    1982).  In *Guglielmi*, Justice Bird emphasized that these protections apply to *all* expressive

9    works, including "entertainment," "works of fiction," "distracting tales for amusement," and

10    "motion picture[s]." 25 Cal. 3d at 867-868 (Bird, J. concurring) (affirming dismissal of right of

11    publicity claim that challenged inclusion of a person's name and likeness in a motion picture).

12    Of particular note here, the California Supreme Court has made clear that the "creative

13    appropriation" of the images of athletes and other celebrities is an important avenue of creative

14    expression:

15    Entertainment and sports celebrities are the leading players in our Public Drama.
      We tell tales, both tall and cautionary, about them.  We monitor their comings and
16    goings, their missteps and heartbreaks.  We copy their mannerisms, their styles,
      their modes of conversation and of consumption. . . .  Their images are thus
17    important expressive and communicative resources: the peculiar, yet familiar
      idiom in which we conduct a fair portion of our cultural business and everyday
18    conversation.

19    *Comedy III*, 25 Cal. 4th at 397 (citations omitted).

20    With this in mind, the California Supreme Court repeatedly has held that as long as an

21    expressive work is "transformative," the protection of free speech under the U.S. and California

22    Constitutions "outweighs whatever interest the state may have in enforcing the right of

23    publicity." *Comedy III*, 25 Cal. 4th 405.  In determining whether a work is "transformative," the

24    inquiry "is whether the celebrity likeness is one of the 'raw materials' from which an original

25    work is synthesized, or whether the depiction or imitation of the celebrity is the very sum and

26    substance of the work in question." *Id.* at 406; *accord Winter*, 30 Cal. 4th at 888.  "[I]n other

27    words," a court must evaluate whether the *work* "containing the celebrity's image is so

28    transformed that it has become primarily the defendant's own expression rather than the

13

443598.09

1  celebrity's likeness." *Id.*

2      Critically, the focus is *not* whether the plaintiff's likeness within the work has been

3  transformed physically, but whether the work *as a whole* is transformative—*i.e.*, whether it

4  "contain[s] significant creative elements that transform [it] into something more than mere

5  celebrity likenesses." *Winter*, 30 Cal. 4th at 881.  To underscore the breadth of this protection,

6  the California Supreme Court in *Winter* pointed out that transformative works "can take many

7  forms, from factual reporting to fictionalized portrayal, from heavyhanded lampooning to subtle

8  social criticism." *Id.*  Turning to the defendants' comic books, which featured supporting

9  characters who were "less than subtle evocations" of the plaintiffs, the *Winter* Court declared

10  that "[a]pplication of the test to this case is not difficult." *Id.* at 890.  Because the characters

11  based on the plaintiffs were "merely part of the raw materials from which the comic books were

12  synthesized" and were part of "*a larger story*, which is itself quite expressive," the Court held

13  that First Amendment defeated the plaintiffs' misappropriation claims. *Id.* (emphasis added).

14      Three years later, a California Court of Appeal applied the "transformative" test to hold

15  that a video game was protected expression, barring the plaintiff's misappropriation claim.

16  *Kirby*, 144 Cal. App. 4th at 50.  There, a singer claimed that the defendant misappropriated her

17  likeness to create a character in a video game, and asserted claims for deprivation of statutory

18  and common law rights of publicity, violation of the Lanham Act, unfair competition,

19  interference with prospective business advantage, and unjust enrichment. *Id* at 53.  While the

20  court accepted that the character's facial features, clothing, and hair style were reminiscent of the

21  plaintiff, the court emphasized that she was only one element of a complex video game. *Id.* at

22  56.  Because these elements of the plaintiff's persona were only a part of the raw material from

23  which the game was synthesized, and were not the game's "very sum and substance," the court

24  had no difficulty concluding that the defendant's use of the plaintiff's persona was

25  transformative, and thus protected by the First Amendment "and the even greater speech

26  protections afforded by the California Constitution." *Id.* at 57.  All of the plaintiff's claims,

27  therefore, failed as a matter of law. *Id.* at 61.

28      The same is true here.  EA's *NCAA Football* and *NCAA Basketball / NCAA March*

1   *Madness* games have all the elements—and more—that the courts in *Winter, Kirby, E.S.S.*, and

2   *Romantics* found to be expressive and transformative.  As a review of the games demonstrates,

3   these works are extraordinarily complex feats of computer engineering combined with artistic

4   expression, comprised of originally designed virtual locations, players, coaches, fans and other

5   game elements.  RJN ¶¶ 1-3.  The games feature original graphics, videos, sound, music and

6   game scenarios, all keyed to the players' manipulation of the game controls and other input.  *Id.*

7   These elements are synchronized to deliver television-quality images and realistic sounds, such

8   as the crunch of football pads, the swish of basketball nets, licensed fight songs for many of the

9   college teams, and play-by-play commentary describing the action.  *Id.*  Players can match more

10  than a hundred teams against each other, control team strategy decisions and individual athlete's

11  movements in real time, and tinker with such subtle details as the weather and crowd noise.  *Id.*

12  Game players can take control of a team as it exists in EA's games or customize it based on their

13  own preferences, altering the characteristics of individual players.  *Id.*  The interactive

14  environment extends beyond single games, allowing players to control teams for entire seasons

15  or manage the college program over a series of years, including recruiting virtual players from

16  high school and monitoring their academic performance off the field or court.  *Id.*  EA's games

17  allow competition against opponents controlled by the game itself, a person connected to the

18  same system, or a person connected over the Internet.  *Id.*  As the above game content and

19  features clearly demonstrate, the creativity and complexity of *NCAA Football* and *NCAA*

20  *Basketball / NCAA March Madness* far exceeds that of other works found to be transformative.

21        Moreover, the information about which Plaintiff complains represents only a small part

22  of the many raw materials that make up the games.  Characteristics such as height, weight,

23  agility and strength are assigned to a virtual player, represented in the game by an original

24  graphic created by EA.  *Id.*  As a review of the games demonstrates, the player's characteristics

25  are displayed visually on certain games screens, but also used by the game as parameters for that

26  virtual player's performance.  *Id.*  The player is assigned to a team, clothed in a jersey and given

27  a number—game elements Plaintiff admits are all properly licensed from the NCAA and CLC.

28  Compl. ¶ 11.  The virtual player can be used in a single game simulation or in the more robust

15

443598.09

1    "Dynasty" and "Campus Legend" game modes.  RJN ¶¶ 1-3.  In the latter two game modes, the

2    virtual player's characteristics evolve over multiple games and seasons simulated by EA's

3    advanced programming.  *Id.*  Virtual players grow stronger, pass more accurately, rebound

4    better, or improve their GPAs based upon choices made by the game player.  *Id.*

5         Consequently, like the comic books in *Winter* and the video game in *Kirby*, *NCAA*

6    *Football* and *NCAA Basketball / NCAA March Madness* are expressive, transformative works

7    protected by the First Amendment and California Constitution.

8    **2.     The First Amendment and the California Constitution Bar Plaintiff's Claims
             Because of the Public's Strong Interest in Information About Sports and**

9    **Athletes.**

10        Separate from the "transformative" test, courts repeatedly have held that the public's

11   interest in information about sports and athletes affords full First Amendment protection to a

12   work that includes information about athletes—including their names, statistics and biographical

13   information (exactly the information Plaintiff complains about here)—and bars misappropriation

14   claims based on such use.  Under this second line of authority that has developed independently

15   of the "transformative" test, Plaintiff's claims are barred by the First Amendment and the

16   California Constitution.

17        In *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400 (2001), the defendant

18   Major League Baseball used a wide array of material in printed programs, videos and its website

19   without permission from the plaintiff baseball players, including "names of players included on

20   All-Star and World Series rosters; descriptions of memorable performances from former games

21   … [and] photographs and video clips taken of plaintiffs when they were playing the game

22   themselves." *Id.* at 410.  In addressing the plaintiffs' common law misappropriation claim, the

23   court held that "[t]he recitation and discussion of factual data concerning the athletic

24   performance of these plaintiffs command a substantial public interest, and, therefore, is a form of

25   expression due substantial constitutional protection," *id.* at 411, and concluded that "the public

26   interest favoring the free dissemination of information regarding baseball's history far outweighs

27   any proprietary interests at stake," *id.* at 415.  The court held that the plaintiffs' claims for

28   violation of their common-law and statutory rights of publicity failed as a matter of law.  *Id.*

16

443598.09

1    In *C.B.C. Distribution & Marketing v. Major League Baseball Advanced Media, L.P.*,

2    505 F.3d 818 (8th Cir. 2007), plaintiff C.B.C. offered "fantasy" online baseball games

3    incorporating the actual names, nicknames, likenesses, signatures, pictures, playing records, and

4    biographical data of major league baseball players. *Id.* at 823.  C.B.C. initially had licensed this

5    information from the Major League Baseball Players' Association.  But when the Players'

6    Association declined to renew the license, C.B.C. sought a judicial declaration of its right to use

7    the players' information without a license, arguing that it had a First Amendment right to use the

8    players' information without a license. *Id.* at 821.  The Eighth Circuit agreed with plaintiff,

9    affirming that the First Amendment protected the plaintiff's right to use athletes' names,

10   statistics and biographical information in an online game.  As the court observed, "the

11   information used in C.B.C.'s fantasy baseball games is all readily available in the public domain,

12   and it would be strange law that a person would not have a first amendment right to use

13   information that is available to everyone." *Id.* at 823.  Noting that "fantasy baseball games

14   depend on the inclusion of all players and thus cannot create a false impression that some

15   particular player with 'star power' is endorsing [the plaintiff's] products," the court held that the

16   First Amendment "trump[ed]" the players' right of publicity. *Id.* at 822-824. *See also CBS*

17   *Interactive, Inc. v. National Football League Players Ass'n, Inc.*, 2009 WL 1151982, at *19

18   (D. Minn. April 28, 2009) ("[L]ike in *C.B.C. Distribution*, the package of information used here

19   [names, player profiles, up-to-date statistics, injury reports, participant blogs, pictures, images,

20   and biographical information] comes within the ambit of the First Amendment").[7]

21   And in *Montana v. San Jose Mercury News*, 34 Cal. App. 4th 790 (1995), the court held

22   that the First Amendment protected the defendant's use of football player Joe Montana's likeness

23   on posters.  "When Joe Montana led his team to four Super Bowl championships in a single

24   decade, it was clearly a newsworthy event.  Posters portraying the 49ers' victories are … 'a form

25   of public interest presentation to which protection must be extended.'" *Id.* at 795 (citations

26   _____

27   [7]    Significantly, CBS currently offers for college football the same online fantasy sports
     game that was found to be protected by the First Amendment in the professional context,
     including all the same types of statistics, biographical information, and individual college

28   players' names. *See* RJN ¶ 6.

ELECTRONIC ARTS INC.'S SPECIAL MOTION TO STRIKE PURSUANT TO
CAL. CODE CIV. PROC. § 425.16 (ANTI-SLAPP)
CASE NO. CV-09-1967-CW

443598.09

1  omitted).  The public has an abiding interest in professional football, so Montana's statutory and

2  common law claims for misappropriation of his name and likeness were barred by the First

3  Amendment.  *See id.* at 796.

4       Taking Plaintiff's allegations as true, it follows that EA's alleged inclusion in its games

5  of players' likenesses, statistics and biographical data enjoys the same free-speech protections of

6  the First Amendment and California Constitution and bars Plaintiff's claims.[8]  Plaintiff

7  acknowledges the vast popularity of NCAA athletics by highlighting their successes and interest,

8  *see, e.g.*, Compl. ¶¶ 5, 11, and confirms that college football and basketball are "closely followed

9  by a large segment of the public."  *C.B.S. Interactive*, 2009 WL 1151982, at *21.  This factual,

10  public-domain information about college athletes commands a substantial public interest, just as

11  such information about profession athletes does.  *See C.B.C.*, 505 F.3d at 823-24; *Gionfriddo*, 94

12  Cal. App. 4th at 411; *Montana*, 34 Cal. App. 4th at 794-96.

13       If a poster of Joe Montana, a program from a baseball game, and a "fantasy sports" game

14  that includes nothing more than players' names, photos, biographical information and statistics

15  are all protected by the First Amendment against publicity rights claims, then so too must *NCAA*

16  *Football* and *NCAA Basketball / NCAA March Madness*, which include a diverse array of

17  additional creative and expressive features that don't exist in these other works.

18      **3.**    **Meritorious Misappropriation Claims Target Advertisements.**

19       In contrast to the allegations here, publicity rights claims traditionally have succeeded in

20

21  [8]    While the Complaint acknowledges that the games do not include the names of players, it alleges that consumers have the ability to add to the games (post-purchase) the names from

22  college team rosters which consumers may download from unaffiliated third-party websites.  *See* Compl. ¶¶ 1, 35 – 39.  To the extent that these allegations seek to impose liability on EA based

23  on consumer's uses of roster names obtained from third parties, they fail for at least three reasons.  First, EA did not engage in the alleged misappropriation, as the Complaint concedes.

24  *See* Cal. Civil Code § 3344(a) (requiring the *defendant's use*).  Second, the theory would be barred by the First Amendment, *see* Section III.B.1 above.  Third, to the extent they seek to

25  impose liability for internet-based conduct, such as consumers' use of EA Locker, they are barred by the Communications Decency Act of 1996 ("CDA"), which provides that "[n]o

26  provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  This

27  immunity extends to publicity rights claims.  *See e.g. Perfect 10, Inc. v. CCBill, LLC*, 488 F.3d 1102, 1119 n.5 (9th Cir. 2007); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1121-23 (9th

28  Cir. 2003).

443598.09

California where the challenge is directed towards the use of a person's name or likeness in an advertisement or endorsement to promote an unrelated product.[9]  The line of authority restricting the use of a celebrity's likeness in commercial advertising "concerns only the market which exists in our society for the exploitation of celebrity to sell products, and ... attempt[s] to take a free ride on a celebrity's celebrity value." *White*, 971 F.2d at 1401 n.3.  This is not the case here. *NCAA Football* and *NCAA Basketball / NCAA March Madness* are not advertisements or commercial speech—*i.e.* "speech that merely proposes a commercial transaction." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Counsel, Inc.*, 425 U.S. 748, 762 (1976).  This reasoning is consistent with a test used in some other jurisdictions, known as the "relatedness" test, which affords First Amendment Protection to the use of a person's name or likeness as long as the use is "related" to the content of the work and is not "simply a disguised commercial advertisement for the sale of goods or services." *Romantics*, 574 F. Supp. 2d at 766; *see also Rogers v. Grimaldi*, 875 F.2d 994, 1004 (2d Cir. 1989); RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 47, comment c.[10]  Here, Plaintiff rightly does not claim that EA's alleged use of his likeness is "wholly unrelated" to the content of the video games or a disguised commercial advertisement or endorsement.

### 4.   All of Plaintiff's Claims Fail Because He Has Not Alleged A Recoverable Injury.

All of Plaintiff's claims also fail because he does not allege the necessary element of injury.  The standing requirements of Article III and the elements of each of Plaintiff's claims

---

[9]      *See, e.g.*, *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 691 (9th Cir. 1998) (use of pitcher's image in beer advertisement); *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 809 (9th Cir. 1997) (use of animatronic figures of television characters in airport bars); *Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 409 (9th Cir. 1996) (use of basketball star's former name in television car commercial); *White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1396 (9th Cir. 1992) (use of game-show hostess's identity in advertisements for electronic products); *Midler v. Ford Motor Co.*, 849 F.2d 460, 461-62 (9th Cir. 1988) (use of sound-alike of famous singer in car commercial featuring singer's hit song); *Motschenbacher v. R.J. Reynolds Tobacco Co.*, 498 F.2d 821, 822 (9th Cir. 1974) (use of famous race car driver's distinctive car in cigarette commercial).

[10]      For the purposes of this motion, EA will assume that California law applies.

443598.09

1   require him to allege facts showing that he was injured.[11]  Conclusory allegations of injury are

2   insufficient to avoid a motion to dismiss.  *See, e.g., Barnett v. Evans*, No. C 06-0193 CW (PR),

3   2009 WL 799402, at *10-11 (N.D. Cal. March 24, 2009) (dismissing complaint for failure to

4   adequately allege injury).  "Threadbare recitals of the elements of a cause of action, supported by

5   mere conclusory statements, do not suffice." *Iqbal*, 129 S.Ct. at 1949.  The same principle

6   applies to claims under Section 17200 and for unjust enrichment, although they are not damages

7   claims.  Even before Proposition 64 added the requirement of alleging injury in fact and loss of

8   money or property to state a claim under Section 17200, a plaintiff was required to allege that he

9   had "given up something which he or she was entitled to keep" in order to claim monetary

10  recovery.  *Day v. AT&T Corp.*, 63 Cal. App. 4th 325, 340 (1998).  Likewise, even if an

11  independent cause of action for unjust enrichment existed under California law—as shown

12  below, it does not—a plaintiff cannot avoid the basic requirements of pleading and proving

13  actual injury by styling his claim as one for unjust enrichment.  *See Peterson*, 164 Cal. App. 4th

14  at 1593-95.

15          Here, Plaintiff's only allegations of injury are entirely conclusory.  The sum total of

16  Plaintiff's injury allegations are: "Plaintiff and class members have been injured," Compl. ¶¶ 74,

17  77, "Plaintiff and class members have been damaged as described above," *id.* ¶ 81, "Electronic

18  Arts' conduct has further caused and is causing damage and irreparable injury to Plaintiff and

19  class members," *id.* ¶ 84, and "[t]o the detriment of Plaintiff and class members, Defendants

20  Electronic Arts and CLC have been and continue to be unjustly enriched as a result of the

21  unlawful and/or wrongful conduct alleged within," *id.* ¶ 90.  Such a "formulaic recitation" of the

22  necessary element of injury is insufficient to state a claim.  *Bell Atlantic Corp. v. Twombly*, 550

23  U.S. 544, 555 (2007).

24          Even if the Court were to extrapolate from Plaintiff's other allegations, Plaintiff has not

25  ───────────────────
    [11]      *See, e.g., MAI Systems Corp. v. UIPS*, 856 F. Supp. 538, 540-42 (N.D. Cal. 1994)
26  (plaintiff must allege injury to have standing); *Butler v. Target Corp.*, 323 F. Supp. 2d 1052,
    1056 (C.D. Cal. 2004) (injury is an element of common-law and statutory right-of-publicity
27  claims); *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 511 (1994) (same for
    civil conspiracy); Cal. Bus. & Prof. Code § 17204 (same for § 17200 claim); *Peterson v. Cellco
28  P'ship*, 164 Cal. App. 4th 1583, 1593-95 (2008) (same for unjust enrichment).

20

ELECTRONIC ARTS INC.'S SPECIAL MOTION TO STRIKE PURSUANT TO
CAL. CODE CIV. PROC. § 425.16 (ANTI-SLAPP)
CASE NO. CV-09-1967-CW

443598.09

1  "nudged [his] claims [of injury] across the line from conceivable to plausible," *id.* at 570,

2  because EA was—and is—legally barred from providing college athletes the compensation

3  Plaintiff demands.  California's Miller-Ayala Act makes it a misdemeanor for anyone, other than

4  attorneys and other exempted persons not relevant here, to provide "remuneration for any value

5  or utility that" a student athlete "may have because of publicity, reputation, fame, or following

6  obtained because of athletic ability or performance."  Cal. Bus & Prof Code §§ 18895.2, 18897.6

7  & 18897.93.  Courts will not recognize damage claims premised on allegations that parties

8  would or should have entered into an unlawful contract.  *See, e.g., Page v. Bakersfield Uniform*

9  *& Towel Supply Co.*, 239 Cal. App. 2d 762, 773 (1966) ("It is a wrongful and improper practice

10  to seek damages dependent upon a violation of the law."); *Picton v. Anderson Union High Sch.*

11  *Dist.*, 50 Cal. App. 4th 726, 730 (1996) (illegal contracts cannot be enforced).  In other words, an

12  opportunity to replead would not cure the defect, because California law bars the conduct

13  Plaintiff now claims EA should have undertaken.

14      **5.**    **Plaintiff's California Statutory Misappropriation Claim is Barred by the
Statute's "Public Affairs" Exemption.**

15

16        Plaintiff's second cause of action for alleged violation of his publicity rights under

17  California Civil Code Section 3344 also fails because the statute expressly exempts from liability

18  the "use of a name . . . or likeness in connection with any . . . public affairs, or sports broadcast

19  or account."  Cal. Civ. Code § 3344(d).  This exemption affords works *even broader protection*

20  against statutory misappropriation than the First Amendment does.  *New Kids on the Block v.*

21  *News America Pub., Inc.*, 971 F.2d 302, 310 n.10 (9th Cir. 1992) ("the section 3344(d) defense is

22  not coextensive with the First Amendment.  Rather, it is designed to avoid First Amendment

23  questions in the area of misappropriation by providing extra breathing space for the use of a

24  person's name in connection with matters of public interest.").

25        EA's alleged inclusion of Plaintiff's likeness meets the statutory definition of "in

26  connection with . . . public affairs."  Cal. Civil Code § 3344(d).  Courts repeatedly have held that

27  expressive works related to a variety of sports are "in connection with … public affairs," and in

28  circumstances less compelling than here.  In *Dora v. Frontline Video Inc.*, 15 Cal. App. 4th 536

443598.09

1    (1993), for example, the court held that the "public affairs" exception applied to surfing, which

2    "has created a life-style that influences speech, behavior, dress, and entertainment, among other

3    things. A phenomenon of such scope has an economic impact, because it affects purchases,

4    travel, and the housing market. Surfing has also had a significant influence on the popular

5    culture, and in that way touches many people." *Id.* at 546. In *Montana*, the court held that the

6    use of Joe Montana's likeness also fell within the Section 3344(d) "public affairs" exception,

7    finding that "the same public interest considerations applicable to surfing apply with equal force

8    to professional football." *Montana*, 34 Cal. App. 4th at 796. And the court in *Gionfiddo* reached

9    the same conclusion with respect to baseball, noting that "[b]aseball, not surfing, is, after all, 'the

10   national pastime.'" *Gionfriddo*, 94 Cal. App. 4th at 416.

11          College football and basketball are of equal interest to the public as professional football

12   and baseball—let alone surfing. Plaintiff concedes as much, alleging that the NCAA "generates

13   hundreds of millions in royalties, broadcast rights and other licensing fees each year." Compl.

14   ¶ 5. Likewise, Plaintiff alleges that "[c]onsumers demand that these [video game] matches

15   simulate actual college matches in the most realistic manner possible," *id.* ¶ 11, which simply

16   underscores the intensity of public interest in college sports.

17          As *Dora*, *Montana* and *Gionfiddo* recognize, "public affairs" includes much more than

18   just traditional news broadcasts, and extends to works—whether informative, entertaining, or

19   both—that relate to "popular culture" and to "real-life occurrences." *Dora*, 15 Cal. App. 4th at

20   545-46. If a film about surfing, a poster of Joe Montana, and a program from a baseball game

21   are exempt under Section 3344(d), then so, too, are *NCAA Football* and *NCAA Basketball* /

22   *March Madness*—games about college football and college basketball. Plaintiff's California

23   statutory misappropriation claim fails for this independent reason.

24        **6.     Plaintiff's Civil Conspiracy Claim Fails Because There is No Underlying
                   Tort.**

25

26          Plaintiff lacks an underlying tort upon which to base his fourth cause of action for civil

27   conspiracy. "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on

28   persons who, although not actually committing a tort themselves, share with the immediate

ELECTRONIC ARTS INC.'S SPECIAL MOTION TO STRIKE PURSUANT TO
CAL. CODE CIV. PROC. § 425.16 (ANTI-SLAPP)
CASE NO. CV-09-1967-CW

1  tortfeasors a common plan or design in its perpetration." *Applied Equip. Corp. v. Litton Saudi*

2  *Arabia Ltd.*, 7 Cal. 4th 503, 510-11 (1994).[12]  Because each of Plaintiff's first three causes of

3  action for misappropriation are barred by the First Amendment and fail for numerous additional

4  reasons,[13] his fourth cause of action for civil conspiracy has no underlying tort, and therefore

5  fails.[14]

6        Furthermore, "allegations of conspiracy must be supported by material facts, not merely

7  conclusory statements." *Woodrum v. Woodward County, Okl.*, 866 F.2d 1121, 1126 (9th Cir.

8  1989) (citation omitted). Keller alleges no facts, at all, to support his conspiracy claim and

9  nudge it pass the theoretical to the plausible. *Twombly*, 550 U.S. at 570. Instead, the Complaint

10  does that which the Supreme Court has admonished against—merely reciting the legal elements

11  of the claim and offering no facts to support it. *See* Compl. ¶ 79 (on "information and belief,"

12  "Defendants, and each of them, have conspired to use class members' likenesses without

13  permission....").

14        **7.    Plaintiff's Section 17200 Fails Because It Lacks a Predicate Violation and
               Seeks an Unavailable Remedy.**

15

16        As with his civil conspiracy claim, Plaintiff lacks an underlying wrong on which his

17  unfair competition claim may stand. Section 17200 "borrows violations of other laws and treats

18  them as unlawful practices that the unfair competition law makes independently actionable."

19  *Goldman v. Standard Ins. Co.*, 341 F.3d 1023, 1036 (9th Cir. 2003) (internal quotations and

20  ────────────────

21  [12]    To the extent that Indiana law applies to the conspiracy claim, Indiana law is in accord
       with California law. Under Indiana law "there is no cause of action for conspiracy as such. The
22     cause of action is for damage resulting from a conspiracy." *Indianapolis Horse Patrol, Inc. v.
       Ward*, 247 Ind. 519, 522 (1966). Plaintiff must show that there was a conspiracy to achieve
23     some unlawful purpose or a lawful purpose through unlawful means. *Id.* "In other words,
       allegations of a civil conspiracy are just another way of asserting concerted action in the
24     commission of a tort." *Boyle v. Anderson Fire Fighters Ass'n Local 1262, AFL-CIO*, 497 N.E.
       2d 1073, 1079 (Ind. Ct. App. 1986).

25  [13]    The first cause of action against the NCAA for deprivation of rights of publicity under
       Indiana law fails for the reasons stated in the NCAA's Motion to Dismiss.

26  [14]    The remaining fifth through seventh causes of action cannot form the basis of Plaintiff's
       fourth cause of action for civil conspiracy. There is no civil conspiracy for a breach of contract.
27  *Hanni v. Am. Airlines, Inc.*, 2008 WL 5000237, at *5 (N.D. Cal. Nov. 21, 2008). And the
       California unfair competition and purported unjust enrichment claims are not stand-alone torts,
28  but, like the civil conspiracy claim, require a separate underlying tort.

23

ELECTRONIC ARTS INC.'S SPECIAL MOTION TO STRIKE PURSUANT TO
CAL. CODE CIV. PROC. § 425.16 (ANTI-SLAPP)
CASE NO. CV-09-1967-CW

1   citations omitted).  In this manner, an unfair competition claim "ride[s] the coattails" of the

2   plaintiff's primary claims.  *Kirby*, 144 Cal. App. 4th at 57 n.3.  Here, there are no coattails to

3   ride.  Because Plaintiff's unfair competition is derivative of his misappropriation and civil

4   conspiracy claims against EA, it fails for the same reasons they do.

5       Separately, Plaintiff's Section 17200 claim fails, because he improperly seeks to obtain

6   monetary relief.  As part of his Section 17200 claim, Plaintiff seeks disgorgement of EA's

7   "profits obtained from the utilization of Plaintiff and class members names and likeness."

8   Compl. ¶ 84.  However, "nonrestitutionary disgorgement of profits is not an available remedy in

9   an individual action under the UCL."  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th

10  1134, 1152 (2003); *see also Alch v. Superior Court*, 122 Cal. App. 4th 339, 408 (2004) (denying

11  a UCL class action claim for non-restitutionary back-pay).  Plaintiff alleges no facts—because he

12  cannot—showing that disgorgement of EA's profits would be restitutionary, "restor[ing] the

13  status quo by returning to plaintiffs funds in which he or she has an ownership interest."  *Korea*

14  *Supply Co.*, 29 Cal. 4th at 1149.  To the contrary, plaintiff has no ownership interest in any of

15  EA's funds and cannot point to a now-disrupted status quo in which he legally possessed the

16  funds.  Plaintiff does not allege that he has a vested interest in EA's profits, nor even an

17  attenuated expectancy.  *See id.* at 1149-50.

18      **8.     Plaintiff's Unjust Enrichment Claim Fails Because There is No Such Claim
              Under California Law and an Express Contract Covers the Same Subject.**
19

20      Finally, Plaintiff's unjust enrichment claim fails as a matter of law for two additional

21  reasons.

22      First, no claim for unjust enrichment exists under California law absent independent

23  grounds for imposing an implied contract or constructive trust on the defendant.  As one Court of

24  Appeal recently held, under California law, "[t]here is no cause of action for unjust enrichment.

25  Rather, unjust enrichment is a basis for obtaining restitution based on quasi-contract or

26  imposition of a constructive trust."  *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457,

27  1490 (2006); *accord Roots Ready Made Garments v. Gap Inc.*, No. C 07-03363 CRB, 2008 WL

28  239254, at *8 (N.D. Cal. Jan. 28, 2008) (dismissing unjust enrichment claim with prejudice).

24

ELECTRONIC ARTS INC.'S SPECIAL MOTION TO STRIKE PURSUANT TO
CAL. CODE CIV. PROC. § 425.16 (ANTI-SLAPP)
CASE NO. CV-09-1967-CW

443598.09

1   Plaintiff has neither alleged that an implied contract exists between the parties nor that a

2   constructive trust would be appropriate.  Thus, Plaintiff fails to state a claim for unjust

3   enrichment because California law does not recognize a claim based on bare allegations that

4   Defendants have "unjustly benefited."  *See id.*

5        Second, to the extent that a limited claim for unjust enrichment is recognized under

6   California law, it is well established that such a claim does fail where there exists "a valid

7   express contract covering the same subject matter."  *Lance Camper Mfg. Corp. v. Republic*

8   *Indem. Co.*, 44 Cal. App. 4th 194, 203 (1996); *accord City of Oakland v. Comcast Corp.*, No. C

9   06-5380, 2007 WL 518868, *4-5 (N.D. Cal. Feb. 14, 2007).  This rule operates to bar unjust

10  enrichment claims regardless of whether or not the contract at issue is between the plaintiff and a

11  defendant.  *See, e.g.*, *4 Hour Wireless v. Smith*, 01 Civ 9133, 2002 U.S. Dist. LEXIS 22680, at

12  *1-2 (S.D.N.Y. Nov. 22, 2002).  Here, Plaintiff alleges that he and other players entered into

13  contracts with defendant NCAA, which "impose specified duties on Defendant NCAA,"

14  including a purported duty not to permit EA "to utilize players' names and likenesses."  Compl.

15  ¶¶ 86-87.  Because Plaintiff's contract with the NCAA, by Plaintiff's own allegations, covers the

16  same subject matter as his unjust enrichment claim, that claim must fail as a matter of law.  *See*

17  *Lance Camper*, 44 Cal. App. 4th at 203.

18                          **IV.    CONCLUSION**

19       For the foregoing reasons, the Court should strike Plaintiff's complaint against EA

20  pursuant to the Anti-SLAPP statute.

21

22  Dated:  July 29, 2009                           KEKER & VAN NEST LLP

23

24

25                                  By:  */s/ Robert A. Van Nest*
                                        ROBERT A. VAN NEST
26                                      Attorneys for Defendant
                                        ELECTRONIC ARTS INC.
27

28

ELECTRONIC ARTS INC.'S SPECIAL MOTION TO STRIKE PURSUANT TO
CAL. CODE CIV. PROC. § 425.16 (ANTI-SLAPP)
CASE NO. CV-09-1967-CW

443598.09