IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAMUEL MICHAEL KELLER, on behalf of
himself and all others similarly
situated,

        Plaintiff,

    v.

ELECTRONIC ARTS, INC.; NATIONAL
COLLEGIATE ATHLETICS ASSOCIATION; and
COLLEGIATE LICENSING COMPANY,

        Defendants.
_____/

No. C 09-1967 CW

ORDER ON DEFENDANTS'
MOTIONS TO DISMISS
(Docket Nos. 34, 47,
48) AND ELECTRONIC
ARTS' ANTI-SLAPP
MOTION TO STRIKE
(Docket No. 35)

Defendants Electronic Arts, Inc. (EA), the National Collegiate Athletics Association (NCAA) and the Collegiate Licensing Company (CLC) move separately to dismiss Plaintiff Samuel Michael Keller's claims against them.  EA also moves to strike Plaintiff's claims against it pursuant to California Civil Code section 425.16 (Docket No. 35).  Plaintiff opposes the motions.  As amici curiae, James "Jim" Brown and Herbert Anthony Adderley filed a brief in opposition to EA's motion to dismiss.  The motions were heard on December 17, 2009.  Having considered all of the papers submitted by the parties, the Court DENIES EA's Motion to Dismiss (Docket No. 34), GRANTS NCAA's Motion in part and DENIES it in part (Docket No. 48), DENIES CLC's Motion (Docket No. 47) and DENIES EA's Motion to Strike (Docket No. 35).

BACKGROUND

Plaintiff is a former starting quarterback for the Arizona

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

State University and University of Nebraska football teams.

EA, a Delaware corporation with a principal place of business in California, develops interactive entertainment software. It produces, among other things, the "NCAA Football" series of video games. In the games, consumers can simulate football matches between college and university teams. Plaintiff alleges that, to make the games realistic, EA designs the virtual football players to resemble real-life college football athletes, including himself. He claims that these virtual players are nearly identical to their real-life counterparts: they share the same jersey numbers, have similar physical characteristics and come from the same home state. To enhance the accuracy of the player depictions, Plaintiff alleges, EA sends questionnaires to team equipment managers of college football teams. Although EA omits the real-life athletes' names from "NCAA Football," Plaintiff asserts that consumers may access online services to download team rosters and the athletes' names, and upload them into the games. Plaintiff claims that, in recent iterations, EA has included features that facilitate the upload of this information.

Plaintiff alleges that EA uses his likeness without his consent. He asserts that NCAA, an unincorporated association based in Indiana, and CLC, a Georgia corporation headquartered in Atlanta, facilitated this use. Plaintiff claims that EA, NCAA and CLC met at NCAA's Indiana headquarters and EA's California headquarters to negotiate the agreements that underlie the alleged misconduct.

Plaintiff alleges other misconduct by NCAA and CLC, related to NCAA's amateurism rules. Plaintiff maintains that NCAA's approval

of EA's games violates NCAA's "duty to NCAA athletes to honor its own rules prohibiting the use of student likenesses . . . ." Compl. ¶ 15.  He cites NCAA Bylaw 12.5, which prohibits the commercial licensing of the "name, picture or likeness" of athletes at NCAA-member institutions.  Compl. ¶ 13.  Plaintiff asserts that CLC must honor NCAA's prohibitions on the use of student likenesses.

Plaintiff charges NCAA with violations of Indiana's right of publicity statute, civil conspiracy and breach of contract.  He charges CLC with civil conspiracy and unjust enrichment.  Against EA, he pleads claims for violations of California's statutory and common law rights of publicity, civil conspiracy, violation of California's Unfair Competition Law and unjust enrichment.  He intends to move to certify his case as a class action and seeks, among other things, damages and an injunction prohibiting the future use of his and putative class members' likenesses.

LEGAL STANDARD

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  Dismissal under Rule 12(b)(6) for failure to state a claim is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff.  NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986). However, this principle is inapplicable to legal conclusions;

"threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not taken as true. Ashcroft v. Iqbal, ___ U.S. ___, 129 S. Ct. 1937, 1949-50 (2009) (citing Twombly, 550 U.S. at 555).

DISCUSSION

I.   Indiana Right of Publicity Claim

Plaintiff alleges that NCAA violated his Indiana right of publicity.  He argues that Indiana law applies to NCAA because its headquarters are located in Indiana and the alleged violation occurred in Indiana.  NCAA argues that Plaintiff's claim fails as a matter of law because he does not allege that it used his image or likeness.  Plaintiff responds that NCAA used his likeness because it "expressly reviewed and knowingly approved each version of each NCAA-brand videogame . . . ."  Opp'n to NCAA's Mot. to Dismiss at 4.

Under Indiana law, personalities have a property interest in, among other things, their images and likenesses.  Ind. Code § 32-36-1-7.  A personality is a living or deceased person whose image and likeness have commercial value.  Id. § 32-36-1-6.  Indiana Code section 32-36-1-8 provides,

> A person may not use an aspect of a personality's right of publicity for a commercial purpose during the personality's lifetime or for one hundred (100) years after the date of the personality's death without having obtained previous written consent from a person . . . .

(emphasis added).

Although the parties do not offer controlling authority on this point, the plain language of the statute favors NCAA's position.  Plaintiff argues that NCAA's liability under Indiana law

4

arises from its knowing approval of EA's use of his likeness.  This interpretation expands liability under the Indiana statute to include persons who enable right of publicity violations.  However, Plaintiff does not offer any authority to show that section 32-36-1-8 encompasses this type of misconduct.  The Court declines to adopt Plaintiff's interpretation.

Plaintiff makes a related argument that NCAA should be held liable under Indiana's right of publicity statute as a co-conspirator of EA, which used his likeness.  He cites cases that provide that co-conspirators can be held liable as joint tortfeasors for damages caused by another co-conspirator.  See, e.g., Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 511 (1994); Boyle v. Anderson Fire Fighters Ass'n Local 1262, 497 N.E.2d 1073, 1079 (Ind. Ct. App. 1986).  However, these cases are inapposite because Plaintiff has not alleged that either EA or CLC, NCAA's alleged co-conspirators, violated Indiana's right of publicity statute.

Plaintiff's Indiana right of publicity claim against NCAA is dismissed with leave to amend to allege that NCAA used his likeness or conspired with others to violate his right of publicity under Indiana law.

II.  California Right of Publicity Claims

California's right of publicity statute provides,

> Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent . . . shall be liable for any damages sustained by the person or persons injured as a result thereof.

United States District Court
For the Northern District of California

5

**United States District Court**
For the Northern District of California

Cal. Civ. Code § 3344(a). The statutory right of publicity complements the common law right of publicity, which arises from the misappropriation tort derived from the law of privacy. See Comedy III Prods., Inc. v. Saderup, 25 Cal. 4th 387, 391 (2001). To state a claim under California common law, a plaintiff must allege "'(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury.'" Hilton v. Hallmark Cards, 580 F.3d 874, 889 (9th Cir. 2009) (quoting Downing v. Abercrombie & Fitch, 265 F.3d 994, 1001 (9th Cir. 2001)). Although the statutory and common law rights are similar, there are differences. For example, to state a claim under section 3344, a plaintiff must prove knowing use in addition to satisfying the elements of a common law claim. Kirby v. Sega of Am., Inc., 144 Cal. App. 4th 47, 55 (2006).

EA does not contest the sufficiency of Plaintiff's claims. It asserts, however, that his right of publicity claims are barred by the First Amendment and California law. The Court considers and rejects each of these defenses in turn.

A.    Transformative Use Defense[1]

A defendant may raise an affirmative defense that the challenged work is "protected by the First Amendment inasmuch as it contains significant transformative elements or that the value of

---

[1] Amici invite the Court to adopt another standard to assess right of publicity claims. Because the Court finds that the transformative test is sufficient for the purposes of this motion, it does not address amici's arguments.

6

the work does not derive primarily from the celebrity's fame."

_Hilton_, 580 F.3d at 889 (quoting _Comedy III_, 25 Cal. 4th at 407)

(internal quotation marks omitted).  The defense "poses what is

essentially a balancing test between the First Amendment and the

right of publicity."  _Hilton_, 580 F.3d at 889 (quoting _Winter v. DC

Comics_, 30 Cal. 4th 881, 885 (2003)) (internal quotation marks

omitted).

        To determine whether a work is transformative, a court must

inquire into

> whether the celebrity likeness is one of the
> "raw materials" from which an original work is
> synthesized, or whether the depiction or
> imitation of the celebrity is the very sum and
> substance of the work in question.  We ask, in
> other words, whether a product containing a
> celebrity's likeness is so transformed that it
> has become primarily the defendant's own
> expression rather than the celebrity's
> likeness.  And when we use the word
> "expression," we mean expression of something
> other than the likeness of the celebrity.

_Comedy III_, 25 Cal. 4th at 406.  "An artist depicting a celebrity

must contribute something more than a merely trivial variation, but

create something recognizably his own, in order to qualify for

legal protection."  _Winter_, 30 Cal. 4th at 888 (quoting _Comedy III_,

25 Cal. 4th at 408) (internal quotation and editing marks omitted).

The analysis "simply requires the court to examine and compare the

allegedly expressive work with the images of the plaintiff to

discern if the defendant's work contributes significantly

distinctive and expressive content."  _Kirby_, 144 Cal. App. 4th at

61.  "If distinctions exist, the First Amendment bars claims based

on appropriation of the plaintiff's identity or likeness; if not,

the claims are not barred."  _Id._

Two California Supreme Court cases "bookend the spectrum" used to measure a work's transformative nature.  Hilton, 580 F.3d at 890-91.  On one end, Comedy III provides an example of a non-transformative work.  There, the defendant's "literal, conventional depictions of The Three Stooges," drawn in charcoal and printed on tee-shirts, did not contain transformative elements that warranted protection by the First Amendment.  Comedy III, 25 Cal. 4th at 409.  Interpreting Comedy III, the Ninth Circuit stated that "it is clear that merely merchandising a celebrity's image without that person's consent . . . does not amount to a transformative use."  Hilton, 580 F.3d at 890.

Winter offers the opposite bookend.  There, a comic book publisher depicted two musicians, Johnny and Edgar Winter, as half-human, half-worm cartoon characters.  Winter, 30 Cal. 4th at 890.  The court affirmed summary judgment in favor of the defendant, holding that the images were sufficiently transformative.  The court stated,

> Although the fictional characters Johnny and Edgar Autumn are less-than-subtle evocations of Johnny and Edgar Winter, the books do not depict plaintiffs literally.  Instead, plaintiffs are merely part of the raw materials from which the comic books were synthesized.

Id.

Using Comedy III and Winter as guideposts, Kirby applied the transformative use analysis to a video game.  There, the court held that the main character in the defendant's video game was transformed.  The plaintiff was a musician and dancer, known for saying the phrase "ooh la la."  Kirby, 144 Cal. App. 4th at 50-51.  Ulala, the main character in the defendant's game, worked as a news

United States District Court
For the Northern District of California

reporter in the twenty-fifth century, "dispatched to investigate an invasion of Earth." <u>Id.</u> at 52. Although there were similarities between the two, the court held Ulala to be "more than a mere likeness or literal depiction of Kirby." <u>Id.</u> at 59. "Ulala contains sufficient expressive content to constitute a 'transformative work' under the test articulated by the [California] Supreme Court." <u>Id.</u> In particular, Ulala was extremely tall and wore clothing that differed from the plaintiff's and the setting for the game was unlike any in which she had appeared. <u>Id.</u>

Here, EA's depiction of Plaintiff in "NCAA Football" is not sufficiently transformative to bar his California right of publicity claims as a matter of law.[2] In the game, the quarterback for Arizona State University shares many of Plaintiff's

_____

[2] EA asks the Court to take judicial notice of the content of the video games "NCAA Football 2006" through "NCAA Football 2009," "NCAA March Madness 2006" through "NCAA March Madness 2008," and "NCAA Basketball 2009;" paragraphs four of the Strauser and O'Brien Declarations summarizing the content of these video games; various press releases announcing the release date of the video games; a United States Copyright Office document indicating the date of first publication for "NCAA March Madness 2007;" an August 15, 2008 order from <u>Kent v. Universal Studios, Inc.</u>, Case No. 08-2704 (C.D. Cal.); and the content of the CBSSports.com Fantasy College Football game. (Docket No. 36.) Generally, in ruling on a motion to dismiss, a court cannot consider material outside of the complaint. <u>Branch v. Tunnell</u>, 14 F.3d 449, 453 (9th Cir. 1994), <u>overruled on other grounds in</u> <u>Galbraith v. County of Santa Clara</u>, 307 F.3d 1119, 1127 (9th Cir. 2002). However, a court may consider exhibits submitted with the complaint and those documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." <u>Id.</u> at 453-54.
      Because Plaintiff refers to the video games in his complaint, the Court GRANTS EA's request for judicial notice of them. Plaintiff does not mention the press releases or other materials proffered by EA. Therefore, the Court DENIES EA's request as to the other materials.

United States District Court
For the Northern District of California

characteristics.  For example, the virtual player wears the same jersey number, is the same height and weight and hails from the same state.  EA's depiction of Plaintiff is far from the transmogrification of the Winter brothers.  EA does not depict Plaintiff in a different form; he is represented as he what he was: the starting quarterback for Arizona State University.  Further, unlike in <u>Kirby</u>, the game's setting is identical to where the public found Plaintiff during his collegiate career: on the football field.

EA asserts that the video game, taken as a whole, contains transformative elements.  However, the broad view EA asks the Court to take is not supported by precedent.  In <u>Winter</u>, the court focused on the depictions of the plaintiffs, not the content of the other portions of the comic book.  The court in <u>Kirby</u> did the same: it compared Ulala with the plaintiff; its analysis did not extend beyond the game's elements unrelated to Ulala.  These cases show that this Court's focus must be on the depiction of Plaintiff in "NCAA Football," not the game's other elements.

Accordingly, at this stage, EA's transformative use defense fails.

B.   Public Interest Defense

"Under California law, 'no cause of action will lie for the publication of matters in the public interest, which rests on the right of the public to know and the freedom of the press to tell it.'"  <u>Hilton</u>, 580 F.3d at 892 (quoting <u>Montana v. San Jose Mercury News, Inc.</u>, 34 Cal. App. 4th 790, 793 (1995)).  "'Public interest attaches to people who by their accomplishments or mode of living create a bona fide attention to their activities.'"  <u>Hilton</u>, 580

10

F.3d at 892 (quoting <u>Dora v. Frontline Video, Inc.</u>, 15 Cal. App. 4th 536, 542 (1993)).

In <u>Gionfriddo v. Major League Baseball</u>, the court held that the defendants were entitled to the public interest defense.   94 Cal. App. 4th 400, 415 (2001).   There, the plaintiffs, four former baseball players, claimed that the defendants' use of their names and statistics violated their rights of publicity.   <u>Id.</u> at 405-07. Their information appeared on a website, which reported historical team rosters and listed names of players who won awards during each season.   <u>Id.</u> at 406.   The defendants also included still photographs of the plaintiffs from their playing days in video documentaries.   <u>Id.</u>   The court characterized these uses as "simply making historical facts available to the public through game programs, Web sites and video clips."   <u>Id.</u> at 411.   Because the public had an interest in the plaintiffs' athletic performance, the First Amendment protected the "recitation and discussion of [their] factual data."   <u>Id.</u>

The public interest defense also applied in <u>Montana</u>.   There, the defendant newspaper sold posters containing reproductions of newspaper pages reporting on the San Francisco 49ers' win in the 1990 Super Bowl; these pages contained images of the plaintiff.   34 Cal. App. 4th at 792.   The plaintiff conceded that the original newspaper accounts were protected by the First Amendment, but challenged their reproduction as posters.   <u>Id.</u> at 794.   The court held that the posters were entitled to the same First Amendment protection as the original news stories.   The court stated,

> Montana's name and likeness appeared in the posters
> for <u>precisely</u> the same reason they appeared on the
> original newspaper front pages: because Montana was

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

> a major player in contemporaneous newsworthy sports
> events.  Under these circumstances, Montana's claim
> that SJMN used his face and name solely to extract
> the commercial value from them fails.

Id. (emphasis in original).  Citing Montana, the Ninth Circuit

stated that the public interest defense "is about . . . publication

or reporting."  Hilton, 580 F.3d at 892.

"NCAA Football" is unlike the works in Gionfriddo and Montana.

The game does not merely report or publish Plaintiff's statistics

and abilities.  On the contrary, EA enables the consumer to assume

the identity of various student athletes and compete in simulated

college football matches.  EA is correct that products created for

entertainment deserve constitutional protection.  See, e.g.,

Gionfriddo, 94 Cal. App. 4th at 410 ("Entertainment features

receive the same constitutional protection as factual news

reports.").  But it does not follow that these protections are

absolute and always trump the right of publicity.

EA cites cases in which courts held that the public interest

exception protected online fantasy baseball and football games.

Although these games are more analogous to "NCAA Football," the

cases are nonetheless distinguishable.  In C.B.C. Distribution and

Marketing v. Major League Baseball Advanced Media, a declaratory

judgment action, the plaintiff sold "fantasy baseball products"

that included the names and statistics of major league baseball

players.  505 F.3d 818, 820-21 (8th Cir. 2007).  Through these

products, consumers could form fantasy baseball teams and compete

with other users.  Id. at 820.  "A participant's success . . .

depend[ed] on the actual performance of the fantasy team's players

on their respective actual teams during the course of the major

12

league baseball season." Id. at 820-21.  The defendant

counterclaimed, arguing that these products violated players'

rights of publicity.  The court disagreed.  It analogized the case

to Gionfriddo, and held that the use of the players' information in

the fantasy game was a "'recitation and discussion'" of the

players' information.  Id. at 823-24 (quoting Gionfriddo, 94 Cal.

App. 4th at 411).

    C.B.C. Distribution is inapplicable here.  Success in "NCAA

Football" does not depend on updated reports of the real-life

players' progress during the college football season.  Further,

EA's game provides more than just the players' names and

statistics; it offers a depiction of the student athletes' physical

characteristics and, as noted, enables consumers to control the

virtual players on a simulated football field.  EA's use of

Plaintiff's likeness goes far beyond what the court considered in

C.B.C. Distribution.

    EA is not entitled to the public interest defense on this

motion.

    C.    Section 3344(d) Exemption

    California Civil Code section 3344(d) provides a public

affairs exemption to the statutory right of publicity.  It exempts

from liability under section 3344 "a use of a name . . . or

likeness in connection with any news, public affairs, or sports

broadcast or account, or any political campaign."  Cal. Civ. Code

§ 3344(d).  This exemption is not coextensive with the public

interest defense; it "is designed to avoid First Amendment

questions in the area of misappropriation by providing extra

breathing space for the use of a person's name in connection with

13

United States District Court
For the Northern District of California

matters of public interest." New Kids on the Block v. News Am.
Pub., Inc., 971 F.2d 302, 310 n.10 (9th Cir. 1992) (citing Eastwood
v. Superior Court, 149 Cal. App. 3d 409, 421 (1983)).

In Dora v. Frontline Video, Inc., a California court held that
section 3344(d) barred a plaintiff's statutory right of publicity
claim. 15 Cal. App. 4th at 546. The defendant's documentary on
surfing contained, among other things, the plaintiff's name and
likeness. Id. at 540. The court held that this use was exempted
by section 3344(d) because the plaintiff's name and likeness were
used in connection with public affairs. In doing so, the court
addressed the meaning of "public affairs." The court distinguished
"public affairs" from "news," stating that "'public affairs' was
intended to mean something less important than news." Dora, 15
Cal. App. 4th at 545. Thus, the subject matter encompassed by
public affairs is not limited "to topics that might be covered on
public television or public radio." Id. at 546.

Here, Plaintiff does not dispute EA's contention that college
athletics are "public affairs." He asserts, however, that
section 3344(d) only applies to factual reporting.[3] In essence, he
asserts that section 3344(d) applies to the same type of
"reporting" as does the public interest defense.

Neither party offered direct authority on the type of use for
which the section 3344(d) exemption applies. However, Montana is

---

[3] EA understands Plaintiff to argue that reporting implicates
newsworthy information. So interpreted, EA claims, Plaintiff's
argument must fail because Dora draws a distinction between "news"
and "public affairs." The Court does not construe Plaintiff's
argument in the same way. Instead, the Court reads Plaintiff to
argue that "NCAA Football" does not constitute "reporting" and, as
a result, EA does not use his name and likeness in a manner that is
exempted by section 3344(d).

**United States District Court**
For the Northern District of California

instructive.  There, the court stated that "the statutory cause of action specifically exempts from liability the use of a name or likeness in connection with the <u>reporting</u> of a matter in the public interest."  34 Cal. App. 4th at 793 (emphasis added).  Thus, without authority requiring otherwise, the Court construes section 3344(d) to require the same type of activity as the public interest defense discussed above, namely reporting.[4]  Although "NCAA Football" is based on subject matter considered "public affairs," EA is not entitled to the statutory defense because its use of Plaintiff's image and likeness extends beyond reporting information about him.

Accordingly, Plaintiff's California statutory and common law right of publicity claims are not barred as a matter of law.

III. Civil Conspiracy Claims

Defendants move separately to dismiss Plaintiff's civil conspiracy claims.  All challenge the sufficiency of Plaintiff's claims, arguing that he does not plead an underlying tort, which is a necessary element.  CLC separately asserts the agent immunity defense.

Plaintiff did not specify the state law under which his civil conspiracy claims arise.  For the purposes of this motion, the Court assumes that his claims arise under California law.

A.   Sufficiency of the Claims

Civil conspiracy "is not a cause of action, but a legal

---

[4] Although section 3344(d) and the public interest defense implicate the same type of activity, they are nonetheless not coextensive because section 3344(d) defines safe harbors for reporting in particular contexts.  <u>See</u> <u>New Kids on the Block</u>, 971 F.2d at 310 n.10.

**United States District Court**
For the Northern District of California

doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." <u>Applied Equipment Corp.</u>, 7 Cal. 4th at 510 (citing <u>Wyatt v. Union Mortgage Co.</u>, 24 Cal. 3d 773, 784 (1979)). "Standing alone, a conspiracy does no harm and engenders no tort liability. It must be activated by the commission of an actual tort." <u>Applied Equipment Corp.</u>, 7 Cal. 4th at 511.

A claim for civil conspiracy consists of three elements: "(1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct." <u>Kidron v. Movie Acquisition Corp.</u>, 40 Cal. App. 4th 1571, 1581 (1995). "The conspiring defendants must . . . have actual knowledge that a tort is planned and concur in the tortious scheme with knowledge of its unlawful purpose." <u>Id.</u> at 1582 (citing <u>Wyatt</u>, 24 Cal. 3d at 784-86). This knowledge must be combined with an intent to aid in achieving the objective of the conspiracy. <u>Kidron</u>, 40 Cal. App. 4th at 1582; <u>Schick v. Bach</u>, 193 Cal. App. 3d 1321, 1328 (1987). A claim of unlawful conspiracy must contain "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." <u>Twombly</u>, 550 U.S. at 556. A bare allegation that a conspiracy existed does not suffice. <u>Id.</u>

Plaintiff alleges that there were meetings among Defendants in California and Indiana. Compl. ¶¶ 54-56. He asserts that Defendants knew of NCAA principles barring the licensing of student-athlete identities, but nonetheless approved EA's games containing the athletes' likenesses without their consent. Compl.

16

¶¶ 12-15.  Finally, he claims that EA's actions violated his California statutory and common law rights of publicity.[5]  These factual allegations sufficiently support liability under Plaintiff's civil conspiracy claim.[6]

B.   CLC's Agent Immunity Defense

CLC maintains that the agent immunity defense bars Plaintiff's conspiracy claim against it.  This defense provides that no liability shall lie "if the alleged conspirator, though a participant in the agreement underlying the injury, was not personally bound by the duty violated by the wrongdoing and was acting only as the agent or employee of the party who did have that duty."  Doctors' Co. v. Superior Court, 49 Cal. 3d 39, 44 (1989).

CLC maintains that Plaintiff's allegations that its role as a licensing company entering into agreements on behalf of NCAA establishes, as a matter of law, that it is NCAA's agent.  These allegations are not sufficient at this early stage to establish CLC's entitlement to this defense.

_____

[5] Plaintiff alleges that Defendants conspired to deprive "class members of their right to protect their names, likenesses and rights to publicity and their contractual, property rights."  Compl. ¶ 80.  For the purposes of this motion, the Court construes this allegation to refer to EA's alleged violation of Plaintiff's California right of publicity because he does not state a claim based on the tortious conduct of any other Defendant.

[6] Citing Everest Investors 8 v. Whitehall Real Estate Limited Partnership XI, 100 Cal. App. 4th 1102 (2002), CLC also argues that it cannot accrue tort liability under a civil conspiracy theory because Plaintiff has not alleged that it can make video games.  This argument is unavailing.  Everest Investors 8 states that "tort liability from a conspiracy presupposes that the conspirator is legally capable of committing the tort -- that he owes a duty to the plaintiff recognized by law and is potentially subject to liability for the breach of that duty."  Id. at 1106.  Nothing in the record indicates that CLC is legally incapable of violating Plaintiff's rights of publicity.

17

United States District Court
For the Northern District of California

IV.   Section 17200 Claim

EA maintains that Plaintiff fails to state a claim under California Business and Professions Code section 17200 because he does not allege an underlying wrong or seek available relief. However, as discussed above, Plaintiff sufficiently asserts right of publicity and civil conspiracy claims.  With regard to relief, he seeks an injunction, which EA concedes is available under section 17200.  Thus, Plaintiff has stated a section 17200 claim against EA.

V.   Breach of Contract Claim

NCAA argues that Plaintiff does not state a breach of contract claim because he has not identified an enforceable contract. Because Plaintiff does not specify the state law under which his claim arises, the Court assumes that California law applies.

To assert a cause of action for breach of contract in California, a plaintiff must plead: (1) existence of a contract; (2) the plaintiff's performance or excuse for non-performance; (3) the defendant's breach; and (4) damages to the plaintiff as a result of the breach.  Armstrong Petrol. Corp. v. Tri-Valley Oil & Gas Co., 116 Cal. App. 4th 1375, 1391 n.6 (2004).

Plaintiff has not identified a contract that he is seeking to enforce.  Although he refers to an NCAA document as a contract, he does not attach the document to his complaint.  Instead, he states that by signing the document, the athletes agree that "they have 'read and understand' the NCAA's rules" and that "to the best of [their] knowledge [they] have not violated any amateurism rules." Compl. ¶ 14.  These phrases, on their own, do not indicate that the document is a contract.  Plaintiff's breach of contract claim

18

against NCAA is dismissed with leave to amend to allege or attach an enforceable contract.

VI.  Unjust Enrichment Claims

Plaintiff claims that EA and CLC were unjustly enriched through the sale of video games that use his likeness.  EA and CLC argue that his claim is barred because California law does not provide a cause of action for unjust enrichment.  Even if it did, EA and CLC argue, Plaintiff's allegations regarding the existence of a contract with NCAA would independently bar an unjust enrichment claim.

California courts appear to be split on whether there is an independent cause of action for unjust enrichment.  <u>Baggett v. Hewlett-Packard Co.</u>, 582 F. Supp. 2d 1261, 1270-71 (C.D. Cal. 2007) (applying California law).  One view is that unjust enrichment is not a cause of action, or even a remedy, but rather a general principle, underlying various legal doctrines and remedies. <u>McBride v. Boughton</u>, 123 Cal. App. 4th 379, 387 (2004).  In <u>McBride</u>, the court construed a "purported" unjust enrichment claim as a cause of action seeking restitution.  <u>Id.</u>  There are at least two potential bases for a cause of action seeking restitution: (1) an alternative to breach of contract damages when the parties had a contract which was procured by fraud or is unenforceable for some reason; and (2) where the defendant obtained a benefit from the plaintiff by fraud, duress, conversion, or similar conduct and the plaintiff chooses not to sue in tort but to seek restitution on a quasi-contract theory.  <u>Id.</u> at 388.  In the latter case, the law implies a contract, or quasi-contract, without regard to the parties' intent, to avoid unjust enrichment.  <u>Id.</u>

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Another view is that a cause of action for unjust enrichment exists and its elements are receipt of a benefit and unjust retention of the benefit at the expense of another.  Lectrodryer v. SeoulBank, 77 Cal. App. 4th 723, 726 (2000); First Nationwide Savings v. Perry, 11 Cal. App. 4th 1657, 1662-63 (1992).

Even under the more restrictive analysis of McBride, Plaintiff sufficiently pleads claims for restitution against EA and CLC on the theory that they obtained a benefit from him through their alleged wrongful conduct.  His breach of contract claim against NCAA does not bar these claims.  Although EA and CLC correctly note that the existence of such a contract could bar a restitutionary claim against a contracting party, it is not clear that his alleged contract with NCAA defined any rights between him and EA and CLC.  Cf. Cal. Med. Ass'n v. Aetna U.S. Healthcare of Cal., 94 Cal. App. 4th 151, 172 (2001) (holding that "as a matter of law, a quasi-contract action for unjust enrichment does not lie where, as here, express binding agreements exist and define the parties' rights").  Thus, Plaintiff has adequately stated his unjust enrichment claim for restitution against EA and CLC.

VII. EA's Anti-SLAPP Motion to Strike

Finally, EA moves under California Code of Civil Procedure section 425.16 to strike all of Plaintiff's claims against it. Section 425.16(b)(1), which addresses Strategic Lawsuits Against Public Participation (SLAPP), provides,

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

20

United States District Court

For the Northern District of California

California anti-SLAPP motions are available to litigants proceeding in federal court.  Thomas v. Fry's Elecs., Inc., 400 F.3d 1206, 1206 (9th Cir. 2005).  California courts analyze anti-SLAPP motions in two steps.  "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity."  Equilon Enter. v. Consumer Cause, Inc., 29 Cal. 4th 53, 67 (2002).  Second, the court "determines whether the plaintiff has demonstrated a probability of prevailing on the claim."  Id.

Assuming that the challenged causes of action arise from protected activity, Plaintiff makes a sufficient showing of his probability of success on the merits.  EA incorrectly argues that Plaintiff has a substantial burden to show probability of success. It maintains that the Court must apply "the same standard governing motions for summary judgment, nonsuit, or directed verdict."  EA's Mot. to Strike at 12.  However, this standard does not apply in federal court.

"At the second step of the anti-SLAPP inquiry, the required probability that [a party] will prevail need not be high."  Hilton, 580 F.3d at 888-89.  The "statute does not bar a plaintiff from litigating an action that arises out of the defendant's free speech or petitioning; it subjects to potential dismissal only those actions in which the plaintiff cannot state and substantiate a legally sufficient claim."  Id. at 888 (quoting Navellier v. Sletten, 29 Cal. 4th 82, 93 (2002)) (quotation marks omitted).  In Thomas v. Fry's Electronics, the case that provides that anti-SLAPP motions are available to litigants proceeding in federal court, the court stated that "federal courts may not impose a heightened

21

**United States District Court**
For the Northern District of California

pleading requirement in derogation of federal notice pleading rules." 400 F.3d at 1207; <u>see also</u> <u>Empress LLC v. City & County of S.F.</u>, 419 F.3d 1052, 1056 (9th Cir. 2005) (holding that "a heightened pleading standard should only be applied when the Federal Rules of Civil Procedure so require"); <u>Verizon, Inc. v. Covad Commc'ns. Co.</u>, 377 F.3d 1081, 1091 (9th Cir. 2004) (holding that procedural "state laws are not used in federal court if to do so would result in a direct collision with a Federal Rule of Civil Procedure" and noting that federal courts have "accordingly refused to apply certain discovery-limiting provisions of the anti-SLAPP statute because they would conflict with Fed. R. Civ. P. 56").

Under Federal Rule of Civil Procedure 8, Plaintiff has sufficiently stated his claims against EA. Accordingly, the Court denies EA's special motion to strike Plaintiff's claims as a SLAPP.

CONCLUSION

For the foregoing reasons, the Court DENIES EA's Motion to Dismiss (Docket No. 34), GRANTS NCAA's Motion in part and DENIES it in part (Docket No. 48), DENIES CLC's Motion (Docket No. 47) and DENIES EA's Motion to Strike (Docket No. 35). Plaintiff's claims for violation of his Indiana right of publicity and breach of contract against NCAA are dismissed with leave to amend. In accordance with this Court's Order of January 15, 2010 on consolidation, Plaintiff has thirty days from the date of this Order to file a consolidated amended complaint. A case management conference is scheduled for April 27, 2010 at 2:00 p.m.

IT IS SO ORDERED.

Dated: February 8, 2010

CLAUDIA WILKEN
United States District Judge